**UNITED STATES of America, Plaintiff,**

v.

**SEARS, ROEBUCK AND COMPANY, INC., Defendant.**

**No. CR 80–183–R.**

United States District Court, C. D. California.

June 26, 1981.

Asst. U. S. Atty. Frederick A. Jacobsen, Asst. U. S. Atty. Herbert B. Hoffman, Sp. Asst. U. S. Atty. Paul G. Gorman, Los Angeles, Cal., for plaintiff.

Stephen D. Miller, Beverly Hills, Cal., for defendant.

## OPINION

REAL, District Judge.

Sears, Roebuck and Company, Incorporated (hereafter SEARS) has renewed its motion for dismissal of the indictment on the ground of prosecutorial misconduct in presentation of the matter to the Grand Jury.

Several reasons are given by SEARS warranting dismissal. They are:

1. Failure of the government to provide the Grand Jury available exculpatory evidence tending to negate the necessary criminal intent for violation of 18 U.S.C. § 542.

2. The treatment by the government of witnesses who were employees or lawyers of SEARS.

3. The issuance of forthwith subpoenas for immediate testimony of SEARS lawyers concerning the production of documents while a motion concerning those documents was pending before the Court.

4. The failure of the lawyer for the government presenting the matter to the Grand Jury to comply with the Local Rules of this Court concerning admission to practice.

5. Disclosure of a previous witness' testimony to another witness without leave of Court as required by Rule 6(e) Federal Rules of Criminal Procedure.

6. The presentation of witness John J. Nevin, Chairman of the Board of Zenith Radio Corporation, who had no relevant evidence.

7. The conduct of the attorney for the government in his comments and instructions to the Grand Jury.

■ The history of this case is long and involved and is really not necessary to an understanding and determination of the present motion. It is enough to say that an indictment was returned by the Grand Jury against SEARS on February 26, 1980 charging conspiracy to defraud the United States and commit offenses against the United States. The indictment is in one conspiracy count and twelve substantive counts charging violation of 18 U.S.C. § 542, Entry of Merchandise into the Commerce of the United States by means of false statements.

The impact the conduct of the attorney for the government in this case had upon the Grand Jury can only be appreciated when it is understood that though programmed as a "false statement" case the facts and applicable law are most intricate and elusive, involving rather esoteric concepts of the customs laws of the United States.

From the original establishment of "12 knights or 12 good and lawful men of every hundred and four lawful men of every vill," by Henry II in 1166 to its introduction to Anglo-American jurisprudence in 1635 the Grand Jury has ideally come to be the shield against over-zealous or politically motivated prosecutors in our American system of criminal justice. The early days were not easy ones. The tyranny of English rule in the colonies tested at every turn the right to an indictment by a Grand Jury but could never succeed in dominating this "basic right of an Englishman." The determination of colonial Americans fighting the tyranny of English kings brought constitutional recognition to the right to Grand Jury indictment with its inclusion as the first sentence of the 5th Amendment to the Constitution.

The Fifth Amendment requirement that infamous crimes be prosecuted by indictment constantly reminds us of the necessity of maintaining a Grand Jury system vigilant to the admonition of the United States Supreme Court in *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962)

"Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will."

It is with these important underpinnings in mind that a Court must approach the serious charges made by SEARS of Grand Jury abuse in this case.

The Grand Jury investigation of SEARS commenced with the issuance of a subpoena duces tecum served on June 30, 1978. The subpoena required the production of documents that was to be answered with one thousand three hundred cartons of records. A later agreement was made between SEARS and the government to delay production until December 18, 1978. The answer from SEARS came in two ways, 1. approximately seven hundred cartons were delivered to the courthouse for presentation to the Grand Jury,[1] and 2. SEARS filed a Motion to Quash or Modify the Subpoena Duces Tecum [In re: Grand Jury Subpoena, Misc. No. 7174. United States District Court for the Central District of California] objecting to the production of the remaining three hundred cartons, or alternatively to permit copies to be delivered instead of the originals.

The hearing on the Motion to Quash or Modify was set before the Honorable David W. Williams on the morning of December 18, 1978 at 9:30 A.M. After the hearing

---

1. The prosecutor declined to accept delivery of the seven hundred cartons of records until after he could interrogate Robert R. Thomas before the Grand Jury.

Judge Williams submitted the matter for decision. SEARS then advised the government of the delivery of the seven hundred cartons of documents and also told Paul Gorman, the attorney for the government, that it was withholding delivery of the remaining three hundred cartons pending Judge Williams' decision. SEARS also advised Mr. Gorman that after the decision SEARS would deliver the remaining documents in accordance with Judge Williams' ruling on the Motion to Quash.

Despite the government's knowledge of SEARS position Robert R. Thomas[2] was called before the Grand Jury and interrogated in such a way as to indicate to the Grand Jury that SEARS had failed totally to comply with the requirements of the subpoena.[3] After excusing Mr. Thomas from further testimony, Mr. Gorman added further fuel to the fire already kindled by the government. Mr. Gorman personally demanded and then served subpoenas on

2. Mr. Thomas was the SEARS employee designated to be SEARS authorized representative before the Grand Jury.

3. Typical of the questioning of Mr. Thomas on this subject is as follows:

Q: May I inquire, first of all, no accounting records kept by the headquarters of Sears have been produced?

A: Not to my knowledge. I believe all the headquarters records are being held, Mr. Gorman.

Q: And the reason for that is what?

A: I can't say, sir. That was our legal instructions of our legal counsel.

Q: You are representing Mr. —

A: Swift.

Q: —Mr. Swift, and then someone advised you that some records pursuant to the subpoena were not being produced.

Sir, who advised you of that?

A: I was advised by that by Mr. Lipnick of our attorneys, Arnstien, Gluck, Weitzenfeld & Minow. Two of the partners are here today.

Q: And Mr. Lipnick is a partner of that firm?

A: Yes.

Q: And I believe Mr. Weitzenfeld is here also?

A: Yes.

Q: And it was from their decision not to provide any accounting records within the headquarters?

A: The headquarters records, right, sir. Grand Jury Transcript, Robert R. Thomas, December 18, 1978 pp. 17–18.

Q: Okay. And there are no accounting records, there are no records whatsoever that have been produced?

A: Not here, sir.

Q: I want to keep the TV department records for last.

What other records or documents pursuant to the subpoena to your knowledge, have not been produced?

A: Well, it would be our comparison shopping department.

Q: What does that include?

A: That would include all records where we went out and competitively shopped competition comparing them to units of our own as to the values and so on, and that would show pricing comparisons. That is the reason we pulled those out of the files.

Q: Why were they not produced?

A: Can't answer that, sir.

Grand Jury Transcript Robert R. Thomas, December 18, 1978 pp. 20–21.

Q: You have no knowledge as to why they were not produced?

A: No sir. That was our attorneys' decision.

\* \* \* \* \* \*

Q: We are getting back to 760. That is Mr. Lipnick and Mr. Weitzenfeld simply advised these should not be produced and you have no personal knowledge as to why?

A: To the best of my knowledge, that is correct.

Q: You have no knowledge as to why?

A: No sir.

Q: So what you are saying is the company did not respond to the subpoena at all, nothing in here is included?

A: For the most part, I would guess—for the most part, with the exception of some fiche and some film and the catalog records. Grand Jury Transcript, Robert R. Thomas, December 18, 1978 pp. 28 & 29 & 86.

Q: Well, in the complete subpoena, your statement is that nothing in the subpoena has been produced with the exception of the fiche and film?

Grand Jury Transcript, Robert R. Thomas, December 18, 1978 p. 87.

and the critical Grand Juror reaction

A JUROR: But I fail to understand why when a subpoena is sent and all this is brought together, why the merchandising material is not here.

Grand Jury Transcript, Robert R. Thomas, December 18, 1978 p. 93.

These excerpts are not exhaustive of the occasions upon which Mr. Gorman approached the subpoena matter as "the company did not respond to any of the provisions of the subpoena."

Stanley Lipnick and Burton Weitzenfeld [4] (the SEARS lawyers who had accompanied Mr. Thomas with the records) to appear forthwith before the Grand Jury.[5]

Appearing before the Grand Jury Mr. Lipnick [6] declined to answer questions pro- pounded by Mr. Gorman until he had an opportunity to consult an attorney.[7] Mr. Weitzenfeld's appearance mirrored and exacerbated the Lipnick problem.[8] The manner of questioning Mr. Lipnick and Mr. Weitzenfeld by the government and Mr.

4. This action by the government was termed "an extraordinary move" by Judge Williams when he was made aware of the subpoenaing of lawyers for a target before the Grand Jury.

It also appears to be in violation of Department of Justice policy expressed in the *United States Attorneys' Manual* Section 9–11.230 which provides:

> All Grand Jury witnesses should be accorded advance notice of their appearance before the Grand Jury. "Forthwith" . . . subpoenas should be used only when swift action is important. . . Considerations, among others, which bear upon the desirability of using such subpoenas include . . . (1) the risk of flight; (2) the risk of destruction or fabrication of evidence; (3) the need for the orderly presentation of evidence; and (4) the degree of inconvenience to the witness.

None of these criteria were met in this case.

5. Mr. Lipnick advised Mr. Gorman that he intended to seek an immediate hearing before Judge Williams to determine the propriety of *the subpoenas.* In answer, Mr. Gorman, threatened Mr. Lipnick with immediate arrest by the United States Marshal.

6. This appearance was because of the unavailability of Judge Williams to hear the matter and the threats of the prosecutor to have him arrested.

7. The pertinent questioning of Mr. Lipnick is as follows:

Q: What is your privilege, on what grounds?

A: I respectfully request an opportunity to retain and consult with counsel before I give testimony to this Grand Jury on the subject that you have just asked.

Q: Without knowing what the questions are going to be? What good would it do you to retain counsel and to ask them?

Are you aware of your rights before the Grand Jury?

A: I think I have a right to retain and be advised by counsel, Mr. Gorman—

Q: All right—

A: —And I am requesting that I be permitted to exercise that right.

Q: Mr. Lipnick, were you provided a subpoena in the hall by me?

A: Yes sir.

Q: At a time at—

A: At 2:00 o'clock I was served with a subpoena.

Q: And did that subpoena provide to you an Advise of Rights form?

A: It had a form attached to it.

Q: Did you read it?

A: Yes, sir.

A: Did you understand it?

A: I believe so.

Q: Do you have any questions on it?

A: No sir.

\* \* \* \* \* \*

Q: Well, I will ask you questions and for each question that you do not wish to answer, you may exercise that right and we will put it on the record if you feel you have today that right. However, I must advise you that I do not agree with you and that a failure to answer questions properly placed to you before this Grand Jury will receive further litigative action.

Are you aware of that situation?

\* \* \* \* \* \*

MR. GORMAN Q: For the record, Mr. Lipnick is making a general refusal to testify based on the fact that he has not had the opportunity to confer with counsel prior to his accepting a Grand Jury subpoena although Mr. Lipnick has stated that he has spoken with Mr. Weitzenfeld and he has been an attorney for several years.

8. The pertinent questioning of Mr. Weitzenfeld is as follows:

Q: Did you direct a production of documents based on a Grand Jury subpoena served upon Sears Roebuck on or about July 30th 1978?

A: Mr. Gorman, at—I believe it was a little after 2:00, although I did not look at my watch, I was served with a subpoena to appear here at 2:00 p. m. As a lawyer, I would like to and as a man, I would like to answer all of your questions but as a lawyer of that many years standing, I believe strongly that my interest, the interest of my client, in the interest of orderly proceedings and justice are best served by my being represented by counsel and until such time as I have engaged counsel, I have not had the time to do so now, I would with due respect to you people—and sorry to keep you here this late this afternoon—respectfully deny—refuse to answer any questions.

Q: Based on what grounds, sir?

A: On the grounds that I desire to employ counsel and seek the advice of counsel in connection with how this matter is to be proceeded—as is to proceed.

Q: Were you provided an Advice of Right form?

Gorman's remarks prompted a Grand Juror to ask:

"A JUROR: How can you force them? In other words, what I mean is they have got the privilege of getting another lawyer even though, I agree with you that they are lawyers, they ought to know what they can say and can't say."

Instead of clearing the air Mr. Gorman, fully aware of the pending motion and SEARS' position on the totality of the documents subpoenaed, answered:

"If the Court directs them to testify they will testify."

> A: I beg your pardon?
> Q: Were you provided in Advice of Rights form which I handed you with the subpoena today?
> A: Mr. Gorman, you will have to hand me the document and ask me what I——whether I was given a copy of a specific form rather than to use——
> Q: Answer the question yes or no, Mr. Weitzenfeld.
> A: I am not familiar with your form, sir.
> Q: Were you handed a form which advised you of your rights before this Grand Jury?
> A: I will give you, sir, what I was handed and you can call them whatever you wish.
> Q: Please refresh your memory with it.
> A: It's an Advise of Rights form, yes, I see it.
> Q: The answer to your question is yes, you have been provided that Advise of Rights form?
> A: Yes I have.
> Q: Have you read it?
> A: Yes, I have.
> Q: Do you understand it?
> A: Yes I do.
> Q: And do you have any questions regarding it?
> A: No, sir, I don't have any question.
> Q: Do you as an attorney have you legal knowledge of basis for the denial based in law and fact of refusing to testify today? In other words, are you refusing to testify based on a sound legal principle recognized by the Court?
> Grand Jury Transcript, Burton Y. Weitzenfeld, December 18, 1978, pp. 3–5.

Parenthetically——the Advise of Rights form provides that a witness is entitled to consult with an attorney concerning a Grand Jury appearance and have counsel present (outside the Grand Jury room) to consult *during* the testimony.

Not satisfied, Mr. Gorman proceeds:

At this early stage of the investigation the effect this conduct had on the Grand Jurors can only be expressed in what the record shows one of the Grand Jurors said about the whole episode:

"A JUROR: Well both of them kind of angered me in that I know everybody has a right to a lawyer but them being attorneys . . ."

Grand Jury Transcript, Burton Weitzenfeld, December 19, 1978 pp. 8–9.

No one can question that the "forthwith" subpoenas for Mr. Lipnick and Mr. Weitzenfeld were in violation of Department of Justice policy.[9] Such violation, no matter

> Q: All right. Are you aware that refusal to answer any questions will bring further litigative action?
> A: Yes sir, I am aware of it.
> Q: Okay, based on Mr. Weitzenfeld's refusal and his statement that no further questions will be answered by him pursuant to his claim of not retaining counsel, at this time I am not going to ask him any further questions.
> If the Grand Jury has any questions they wish to put to Mr. Weitzenfeld, please feel free to do so at this time.
> I will ask the foreman not to release Mr. Weitzenfeld but to allow him to wait in the other room until we have had a chance to discuss and consider further conditions with the Grand Jury.
> The Foreman: Okay.
> Mr. Gorman: Thank you, Mr. Weitzenfeld.
> The Witness: Thank you. Thank you.
> (Whereupon the witness was excused from the Grand Jury room.)
> Mr. Gorman: Okay, we have not gone off the record.
> You have had two attorneys before you. They refused to answer based on what may or may not be a valid privilege. *Personally, I do not think it is.* (emphasis added).
> Grand Jury Transcript, Burton Y. Weitzenfeld, December 18, 1978, pp. 7–8.

9. Section 9–11.230 of the *United States Attorneys' Manual*, entitled "Limitations on the Grand Jury Subpoena" provides:

> "All Grand Jury witnesses should be accorded reasonable advance notice of their appearance before the Grand Jury. '[F]orthwith' . . . subpoenas should be used only when swift action is important . . . Considerations among others, which bear upon the desirability of using such subpoenas include . . . (1) the risk of flight; (2) the risk of

how egregious, does not necessarily infect the Grand Jury process in returning an indictment. It is relevant, however, to set the tone of this entire investigation and defines at the outset the overreaching of the government in its presentation to the Grand Jury. *United States v. Wilson*, 614 F.2d 1224, 1227 (9th Cir. 1981).

The comments of Mr. Gorman and the nature of his probe into the request for the right to consult a lawyer with Messrs. Lipnick and Weitzenfeld were just the beginning of the pernicious disregard of the duty of fairness which must be imposed upon an

attorney for the government in Grand Jury proceedings. Here it is obvious that the effect was prejudicial to SEARS' right to a dispassionate and unprejudiced view of the evidence.

The hostility of government counsel throughout the questioning of James K. Flummerfelt, Jerome Brennan, Dennis R. Allen, Robert R. Thomas, Edward D. Maxwell, John Stanley Noble,[10] W. C. Hicks and C. William Van Tilberg can best be summed up in a colloquy between Mr. Gorman and the Grand Jury during Mr. Flummerfelt's testimony on October 24, 1979.[11] The statements of Mr. Gorman read like a scathing

---

> destruction or fabrication of evidence; (3) the need for the orderly presentation of evidence; and (4) the degree of inconvenience to the witness." *United States Manual*, Section 9–11.230.

10. Grand Jury Transcript, John Stanley Noble, October 23, 1979, pp. 159–160.
   After excusing Mr. Noble this colloquy transpired:
   A JUROR: I am interested in something. Do you feel that he was aware there was a two-way situation, that a price, on the agreed price a negotiated price, that he was aware of the lower price or the higher price at that time when he made—when he was making up his forms to send to the Customs officials? Do you feel that he was aware of that at that time?
   MR. GORMAN: Well, you have to realize where the situation usually occurred. The invoice and everything came from the manufacturer, from Sanyo, okay? That would come with the merchandise over to the custom house broker, like here in Los Angeles. The broker would look at it and say, "Okay, here is the information, send it to Customs."
   Okay, the broker is really not aware of what is going on. I am saying that he was advised by Mr. Brennan that there was number one, a rebate situation going on and that there was an over and under, billing situation going on under ordinary circumstances that would indicate to him that the prices given to Customs were not the actual price, and that he would have the responsibility to go to Customs and tell them that. He is saying, "No, I did not do this even though it was my responsibility because Brennan and Robinson told me they were taking care of it."
   What he did admit to was this was the only instance that he did do this and it was his responsibility. I mean, it creates a great big area of question why this is the only one and why you go outside the scope of your authority.

> He did say that nobody in his line of authority told him not to do this, only the fact that this guy—these people told him not to."

11. The pertinent colloquy is found in the transcript of the testimony of James K. Flummerfelt on October 24, 1979, pp. 71–76 as follows:
   MR. GORMAN: We are back on the record now while Mr. Flummerfelt is outside the Grand Jury room. I am trying not to twist these questions. I am trying to be as clear and as logical as I possibly can. If the jury thinks that I am in any way trying to trick or twist or anything, I am trying to get an answer of how much did the thing cost. No matter if you send a check or a letter of credit to somebody or a $100 bill to somebody, if you know that you are purchasing something and you expect money back, if you give them a check for $110 to purchase something and you know that you are going to be receiving $10 back, how much does the item cost?
   A JUROR: That's a straight question.
   A JUROR: But he doesn't receive it back until he buys the black and white, right?
   MR. GORMAN: He is expecting. What he has testified to is there is an overbilling because of some system where Sears allowed itself to be billed over its agreed price. You and I agree to a price and that amount, he said, he expected a return. He said, and I am sure he testified directly, he said that he expected all of the overbilling to be returned at some time to Sears.
   Let us say the overbilling in this case is $10. If he made this arrangement, this whole transaction even though he sent the letter of credit or even though he would have sent a check or whatever, if he expected a $10 return how much did it cost? Is there anybody here who has any problem with my question? I am making it as simple and basic to him as I can.
   A gentleman had his hand up? Does that answer your question?

argument giving the personal opinion of a prosecutor on the credibility of a witness

A JUROR: There seems to be some difficulty in him establishing the fact that there is a $10 thing that he keeps talking about contracts. Well, if they made a contract, there had to be some kind of consideration here, and the consideration was money or the exchange of goods that he's going to get back later which was the $10 or whatever amount, like you said, X. And it seems to me that he can't get his terms or definitions of what you're talking about or he wants to—

MR. GORMAN: *Cannot or will not.* (emphasis added)

A JUROR: Well, will not. But it's the same thing that occurred yesterday.

MR. GORMAN: Take that into consideration. I may think it is will not; you may think it is cannot. I do not want to influence you. It is not my job. I can tell you the possibility or he may be trying to evade to protect the company. That is one of the things you have to consider in your interpretation of his testimony. *But to me, anyway, and if anybody in the Grand Jury thinks it is different it defies logic in that scenario*—he testified to the fact that he knew they were getting that entire overbilling back. If they were getting it back, how much did that item cost? If he said it still cost $110, then something is really wrong to my way of thinking. If anyone in the Grand Jury thinks differently, I would like you to bring it up either to me or to him. (emphasis added)

A JUROR: It sounds like they're also thoroughly indoctrinated onto this plan that they can't seem or won't—

MR. GORMAN: I cannot comment on that.

There was a contract made, whether verbal or written, but it seems to be that it is in the records that there have been considerations made with the sets from Korea, but they do not seem to expand on the fact that this was a consideration that was given to Sears. First of all, he did say he was expecting a return somehow. The question is that if he was expecting a return, in our terms for the statute, for this violation, if they were expecting the overbilling to be returned, what was the true unit cost to be placed on the Customs documents? When we meet next time I am going to read all the invoice requirements for Customs documents to make sure your decision is right out of the U. S. Code. Today I can tell you that one of the requirements is they give the actual cost.

Now, the function of the Customs service is to determine what is coming in. Is it going to harm our health, welfare, morals, whatever, economy? It has to be described accurately so the Customs service can determine what it is. They have to appraise it for value

that would not withstand attack for misconduct if made to a petit jury during trial.

or duty. One of the ways of appraising it is by how much does it cost. That is not the only way, but it is one of the ways. So they are required by law not only to give the unit price, what they are actually paying for it, but also any financial aspects of the transaction which would, if not given, preclude Customs from knowing everything about the transaction or if given, allow Customs to examine all aspects of the transaction and give a proper duty appraisement. For our purposes, value if secondary to whether or not they gave the correct statement.

We are talking about overbilling for a second. If they had an overbilling amount where they told Customs that this item cost $110, and they knew they were receiving $10 of that back, then what is the unit cost? In my way of thinking it is $100. If that is correct and if they put down $110 when they knew it was $100 because they expected that $10 back, then you have an entry by means of a false statement because it is not $110. If they knew about it, it is the knowledge requirement that leads to the felony charge, those three elements.

Conversely on the undervaluation—that is why I tried to separate it because when I come back to you, the overvaluation for the most part is beyond the statute of limitations, so I have to rely on the undervaluation. The classic Customs fraud case—I told you people this before—is where an importer says, "Well, I'm buying these units at $1.00 a unit, but I'll tell Customs it's only 50 cents a unit and then I'll only have to pay half as much duty and I'll save myself a lot of money."

In this overvaluation situation, they probably paid more duty. Now, there are a lot of reasons why they probably did that. They are in this over-under billing situation. They paid more duty than they would have had to pay so they might be getting a refund. They could go to Customs and say, "Give me a return." They have not done that.

We have separated to the other half the underbilling situation. What they are saying is, "Well, we paid"—I am interpreting now what they would say. "We paid too much duty here. Therefore, even though we made a false statement, therefore, we are making another false statement on the other side to undervalue below the negotiated price to return all this money that we overvalued."

(Whereupon the witness reenters the Grand Jury room)

MR. GORMAN: We are still on the record. I am still speaking.

Therefore, they should counterbalance or offset and the real question is: Is an accurate, complete and true statement made on either side.

The prosecutor in patent and flagrant disregard of his obligation to be fair and objective in his questioning of witnesses before a Grand Jury [12] constantly demanded "yes" or "no" answers to questions that concerned complex practices that were not susceptible of one-word answers. When SEARS employee Dennis Allen [13] objected that he could not answer a hypothetical question because the prosecutor was putting words into his mouth the prosecutor responded, "you sound like an Abbott and Costello movie." [14]

The questioning of Mr. Flummerfelt also points up in the totality of the presentation why the government would be obligated to provide the Grand Jury with the deposition of Mr. John B. Rehm of November 30, 1979 [15] on the crucial issue of intent and the concept of price—agreed, contract, actual, invoice—that was defined only in terms of Mr. Gorman's personal view of this complex economic principle.[16] The prosecutor totally ignored the comment of the United States Supreme Court in *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) where commenting upon the broad scope of the Grand Jury's investigative duties the Court indicates an investigation is not complete

"until every available clue has been run down and all witnesses examined in *every proper way* to find if a crime has been committed" Id. 414 U.S. at 344, 94 S.Ct. at 618 (emphasis added)

The government argues that the hostility of the prosecutor to the Grand Jury witnesses that were SEARS employees was proper and prompted by the evasive manner in which these witnesses were testifying. Hostility, like beauty, may well be in the eyes of the beholder. This Court views the questioning by Mr. Gorman as a running argument to the jury of his own views of the facts as he would have them be rather than an attempt to elicit facts in such a manner as to make a clear and unbiased presentation to the Grand Jury in the very technical aspects of customs laws. The incessant commands of the prosecutor ordering SEARS employees to respond "yes" or "no" to complex, unintelligible and argumentative questions girded with his sarcastic remarks was calculated to and did de-

**12.** "It is the duty of a prosecutor presenting a case to a Grand Jury not to inflame or otherwise improperly influence the jury against any person." *United States v. Di Grazia*, 213 F.Supp. 232, 235 (N.D.Ill.). *See also United States v. Abbott Laboratories*, 369 F.Supp. 1396 (E.D.N.Car.1973). Standard 5.7 of the *American Bar Standards for Criminal Justice: The Prosecution Function* (1st ed. 1971) provides, in pertinent part:
"The interrogation of all witnesses shall be conducted fairly, objectively and with due regard for the dignity and legitimate privacy of the witness, and without seeking to intimidate or humiliate the witness unnecessarily."

**13.** Grand Jury Transcript, Dennis Allen, November 7, 1979, p. 83.

**14.** When Mr. Allen was unable to provide "yes" or "no" answers to various poorly phrased questions he was threatened with contempt proceedings as follows:
Q: It is still in consideration?
A: Consideration for what?
Q: I am going to ask you one more time and I am going to—if you don't answer yes or no, I am going to ask you to return tomorrow. I am going to put you before a judge. I am going to have you get before a judge and I am going to say, "Judge, will you please instruct the witness to say yes or no."
Now I want a yes or a no out of that.

**15.** The government had taken the deposition of John B. Rehm, a lawyer that had been engaged by SEARS to represent it in connection with its importation of Japanese television receivers.
Mr. Rehm's deposition indicated that he had advised SEARS that the handling of disclosures to Customs was proper. He also explained much of the technical aspects of customs entry of imported goods particularly in the context of this case.
This deposition was never presented nor was the Grand Jury advised of its existence. Neither was the Grand Jury advised of certain disclosures that had been made to Customs as early as 1971.

**16.** This is especially true since Mr. Gorman, questioning Customs Agent Albert Wetzel put interpretations on the so-called "Rehm memo" without the explanations made by Mr. Rehm in his deposition. Grand Jury Transcript, Albert C. Wetzel, February 26, 1980.

prive the Grand Jury of its ability to fairly view the testimony of SEARS employees.

The Grand Jury is an independent constitutional creation relegated to no particular branch of our government. *United States v. Chanen*, 549 F.2d 1306 (9th Cir. 1977). Because of its independence and neutrality the Grand Jury has traditionally been termed an "arm of the Court." Grand Jurors are drawn from voter's lists to assume, without previous experience, a terribly important role in the complexities of our criminal justice system.

A Grand Juror's role involves two separate but closely related functions, viz., investigating whether or not possible violations of federal law occurred; and returning indictments if probable cause exists to conclude that an offense was committed and that the proposed defendant committed it. See *Hendricks v. United States*, 223 U.S. 178, 184, 32 S.Ct. 313, 316, 56 L.Ed. 394 (1912); *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919). The independence of its function has been described by the United States Supreme Court in *United States v. Dionisio*, 410 U.S. 1, 16–17, 93 S.Ct. 764, 772–73, 35 L.Ed.2d 67 (1973) as:

> "The Fifth Amendment guarantees that no civilian may be brought to trial for an infamous crime 'unless on a presentment or indictment of a Grand Jury.' This constitutional guarantee presupposes an investigative body 'acting independently of either prosecuting attorney or judge' *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960) . . . whose mission is to clear the innocent, no less than to bring to trial those who may be guilty."

It is to guarantee this independence and impartiality that the role of the attorney for the government must be one of very special sensitivity. The prosecutor represents—much like the judge in a trial—a dominant figure and the only person to whom the Grand Jurors can realistically look for guidance in their moment to moment concerns as the investigation unfolds. The prosecutor fills this position without the counterbalance of an opposing counsel objecting to any overstepping or of a trial judge maintaining the balance necessary to an impartial consideration by the Grand Jury.[17]

It is in this performance of his duties before a Grand Jury that the attorney for the government must leave the advocate's role. It is here that the attorney for the government must leave a prosecutor's feel of "the thrill of victory" outside the Grand Jury room. It is here, in the hands of the attorney for the government "[t]he greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding" *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J. dissenting at p. 479, 48 S.Ct. at 573).

It is when the neutrality of the prosecution is questioned for flagrant overreaching that the Court must determine whether "a line must be drawn beyond which a prosecutor's control over a cooperative grand jury may not extend." *United States v. Samango*, 607 F.2d 877, 882 (9th Cir. 1979).

To chronicle the prosecutorial misconduct in this case would require publication of almost the entire transcript of the Grand Jury proceedings. Starting with the appearance of Messrs. Thomas, Lipnick and Weitzenfeld before the Grand Jury through the testimony of the SEARS employees and culminating in the appearance of John J. Nevin, Chairman of the Board of Zenith Radio Corporation, Mr. Gorman unveiled his own personal hostility with increasing comments amounting to unsworn testimony and misstatements of the law.[18]

---

17. There has been much criticism of the Grand Jury process as a rubber stamp for prosecutors. This case particularly points up the need for an independent advisor and auditor who could monitor Grand Jury proceedings and protect Grand Jurors from unfair prosecutorial conduct.

18. Mr. Gorman's questioning of Agent Wetzel sums up the hostility and overwhelming desire for return of an indictment.

John J. Nevin was brought to the Grand Jury on September 11, 1979 "as a complaining witness, so to speak, for the American television industry" (Grand Jury Transcript, John J. Nevin, September 11, 1979 p. 21). His appearance, at least according to an affidavit filed by Mr. Gorman, was without having been first interviewed by Mr. Gorman or Mr. Gorman being advised of the nature of his testimony.[19] In the contrasting atmosphere to the SEARS employees, Mr. Nevin was introduced with "everybody here is friends" (Grand Jury Transcript John J. Nevin, supra, p. 66). Mr. Nevin, punctuated with remarks by Mr. Gorman,[20] proceeded to bring home to the Grand Jurors the devastating effects that Japanese industry has had on our American economy. Lest the Grand Jurors not be sufficiently impressed with Mr. Nevin's complaint Mr. Gorman, poignantly reminds the Grand Jurors:

> "Now if a company comes in and precludes that American company from making a profit by losing money and, I think, from the evidence we have taken here so far the Japanese manufacturers probably sold most of these at a cost or below cost basis—

> Q: Agent Wetzel, getting about ready to wind it up, do you have a conclusion or a statement you would like to make regarding your investigation and the conclusions drawn by yourself and the agents of the U. S. Treasury regarding this case?
> A: Well, in my opinion this is probably one of the major fraud cases ever found by customs, not only the method that was used and the—they even—Sears even gave a name to this. They called it a cover mode operation.
> Q: Would you say that constituted a scheme on their part?
> A: Very much a scheme.
> Q: A concerted effort?
> A: A concerted effort, and the delay that we have encountered in trying to conduct this investigation without good subpoena powers has delayed us. We have no idea at this time of how immense this violation is.

19. It seems incredible to this Court that any lawyer, particularly one charged with the sensitive responsibility of presentation of matters to a grand jury, would present a witness without interviewing a witness to gain full knowledge of what evidence the witness can contribute to the indictment process.

Q: Would that be correct in your eyes?

A: Yes sir.

MR. GORMAN: If that is so, may they come in here and act in concert with an American manufacturer or American retailer rather, such as Sears, which is in business to make a profit and allow them to undercut an American manufacturer by several hundred dollars or by even one hundred dollars. The only way they can do that is in violation of the law."

(Grand Jury Transcript, John J. Nevin, supra pp. 43–44).

Did the 85 pages of the same sort of discussion packaged in patriotic fervor by both Mr. Nevin and Mr. Gorman[21] affect the Grand Jury? Post hoc judgments are at best difficult but the effects here are clearly apparent when a Grand Juror asks:

> "A JUROR: I'm just curious. If this dumping hadn't taken place and the American T.V. companies were allowed to compete in a normal way would Zenith television sets cost the same now or less?"

(Grand Jury Transcript, John J. Nevin, supra p. 66).

20. Mr. Gorman not only acted as the foil for Mr. Nevin's—save American industry speech—he engaged in a preliminary discourse with the Grand Jury where he improperly presented his own unsworn testimony as to facts and events far beyond the subject matter of the investigation, improperly mischaracterizing the previous testimony of witnesses (SEARS employees) who had appeared before the Grand Jury and incorrectly counseled the Grand Jury on the applicable law, including misstating the elements of the offenses under investigation.

21. During the discussions the participants opined how American companies—Sylvania, Magnavox, North American Rockwell and Motorola, "it made police radios"—have all been run out of business by Japanese imports, connected the oil crisis in the United States to the importation of television receivers from Japan, the rising price of children's clothes caused by Japanese competition, the loss of 64,000 American jobs as the result of bankruptcy of American companies and likened the alleged crimes of SEARS to rape, kidnapping, bank robbery, illicit drugs and hijacking.

The Grand Jury—not the prosecutor—is charged with deciding probable cause to indict. It is clear from the Nevin transcript that Mr. Gorman usurped that function by asserting to the Grand Jury *his personal belief* buttressed by Nevin's irrelevant ramblings that SEARS was guilty.

Dismissal of an indictment is a serious and drastic penalty. No Court undertakes the prospect lightly. But when the conduct of a prosecutor before the Grand Jury so seriously undermines the independence and objectivity of this Constitutional institution that it impinges upon Constitutional due process the Court must intervene in the only way it can to protect a defendant's rights and assure that such conduct will not be repeated. It cannot stand idly by and watch an important American institution misused or permit conduct which can lead to a total abrogation of the Fifth Amendment right to a Grand Jury indictment. *United States v. Samango*, 607 F.2d 877 (9th Cir. 1979); *United States v. Whitted*, 325 F.Supp. 520 (D.Neb.1971), rev'd on other grounds 454 F.2d 642 (8th Cir. 1972).

Blind zeal in the prosecution of any criminal defendant, no matter how well intentioned by the prosecutor and no matter what the personal opinion of the prosecutor of the heinous nature of the alleged crime being investigated cannot be tolerated in an ordered society. Nor can misguided high purpose justify unfairness in using what was designed to be an independent arbiter between a citizen and his or her government. Unfairness is anathema to the dispensation of justice and I can be no part of the totality of a Grand Jury proceeding that I can only characterize as unfair.

The prosecutor's conduct upon complete review of the Grand Jury transcripts is reminiscent of antics which were condemned over 70 years ago in *United States v. Wells*, 163 F. 313 (D. Idaho 1908). Then, as now, the remedy for this extreme misconduct can only be dismissal of the indictment.

The indictment is dismissed.[22]

■ There is further reason for dismissal of Counts 2, 3, 4, 5 and 6 of the indictment. The indictment was returned February 26, 1980. The acts charged in Counts 2, 3, 4, 5 and 6 were committed during 1974 or more than the five year statute of limitation provided in 18 U.S.C. § 3282.[23]

The government claims waiver of the statute of limitation by reason of a letter signed by counsel for SEARS. No authority is shown for the act of counsel. Counsel cannot waive a constitutional or statutory right for a client. The client must waive. The government furnished the Court with a resolution from the Board of Directors authorizing Lloyd S. McClelland, Vice President and Secretary of SEARS who signed the so-called waiver to

"... institute, prosecute and defend litigation, on behalf of the Company, in all courts and before all administrative agencies; and to take any actions and do

---

22. The Grand Jury Transcript of June 29, 1978 leaves the Court with an uneasy feeling beyond what is clearly identifiable as misconduct. When Mr. Gorman is quoted as saying:

"I have given you off the record a brief overview, and you had an opportunity to ask some questions. Are there anymore now before I bring the agent in?"

Grand Jury Transcript, June 29, 1978, p. 2. If this overview was anything like the ones transcribed the effects can never be known.

23. The testimony of Albert C. Wetzel on February 26, 1980 clearly shows that the government took the position that the Statute of Limitations had run on the Sanyo transactions alleged as overt acts in the conspiracy count. (Cts 2–6).

Q: All right. In terms of violations for Sanyo, did you find that any entries were within the five-year statute of limitations?
A: No sir.
Q: Did you find any conspiratorial overt acts within the five-year statute of limitations?
A: No sir.

Grand Jury Transcript, Albert C. Wetzel, February 26, 1980, pp. 35–36.

Why these transactions were presented for indictment on the conspiracy, as well as substantive, counts is curious. What can best be adduced from the evidence is the existence of two separate conspiracies—one on the Sanyo transactions—one on the Toshiba transactions. If this were a football game it would be termed "piling on."

anything incidental thereto that he may deem proper including, but not in limitation of the foregoing, the authority to appoint attorneys and execute pleadings, affidavits, substitutions of attorney, releases and satisfactions of judgment."

Nowhere in that resolution is there an authority of waiver of SEARS' rights—particularly of a statutory right in a criminal prosecution. A waiver must be made by the client, voluntarily and understandingly with full knowledge of the right waived.

Counts 2, 3, 4, 5 and 6 of the indictment are dismissed.