**UNITED STATES of America**

v.

**Richard Joyner HOLLAND Sr., and Richard Joyner Holland Jr., Defendants.**

**No. 2:97cr139.**

United States District Court, E.D. Virginia, Norfolk Division.

Feb. 3, 1999.

---

Robert J. Seidel, Jr., James A. Metcalfe, United States Attorney's Office, Norfolk, VA, William L. Finch, Department of Justice, Criminal Division—Fraud Section, Washington, DC, for plaintiff.

James Crawford Roberts, Alan Dale Albert, Mays & Valentine, Norfolk, VA, Hunter Wilmer Sims, Jr., Kaufman & Canoles, Nor-

folk, VA, Craig Thomas Merritt, Alexander Wellford, Christian & Barton, Richmond, VA, for defendants.

## OPINION AND ORDER

MORGAN, District Judge.

This matter is before the Court on the Defendants' (Hollands) Applications for attorneys' fees and litigation costs pursuant to the Hyde Amendment, the Hollands' motion to strike a portion of the Government's (Prosecution or Government) response to their Hyde Amendment Applications, and Richmond Newspapers, Inc.'s (RNI) motion to intervene and unseal certain documents. A hearing was held on these matters on Wednesday, August 19, 1998 and the Court indicated its findings from the bench. This Order will GRANT the Hollands' Motion to Strike, ENTER JUDGMENT in favor of the Hollands for reimbursement of certain fees and costs and GRANT in part the motion of RNI and FURTHER EXPLAIN the rationale for the Court's rulings.

PART I. FACTUAL FINDINGS BASED UPON THE RECORD [1]

The Court FINDS that the Federal Deposit Insurance Corporation's (FDIC) proceedings and the prosecution which its proceedings precipitated are interrelated. A review of the pertinent facts should begin with the events leading to the FDIC investigation of the Farmers Bank of Windsor (the bank), which began December 7, 1991. The chronology of material facts begins on November 7, 1991 and ends on April 16, 1998.

## A. THE NOVEMBER 7, 1991 LETTER

On November 7, 1991, Richard J. Holland Jr. (Holland Jr.) wrote a letter to Lyle Helgerson, Regional Director of the FDIC (Helgerson) (Govt.Ex. FDIC–2, Holland Jr. letter of November 7). The letter transmitted payment of civil monetary penalties which were imposed upon the officers and directors of the bank based upon occurrences prior to 1990. The letter was strident in its criticism of the FDIC in general and Helgerson in particular. On December 7, 1991, one month to the day after the Holland Jr. letter, a team of FDIC investigators, led by Chief examiner Edward L. Ostrowski Jr. (Ostrowski), appeared at the bank and began an investigation, the aftermath of which lasted until April 16, 1998.

## B. THE EVIDENCE OBTAINED DURING THE DECEMBER 7, 1991 INITIAL FDIC INVESTIGATION

The evidence obtained through the FDIC's December 7, 1991 investigation is not in dispute. All relevant bank documents requested by the FDIC were produced. Ostrowski stated in his report (Def.Ex. 136, January 23, 1992 memo of Ostrowski to Helgerson at P. 2, ¶ 5) that "the apparent violations were not concealed."

The FDIC investigation focused upon a series of seven loans, four of which the bank booked in the name of June O. March (Mrs. March) and three in the name of Gerald C. Jaffe (Jaffe) during the period from November 21, 1990 to July 8, 1991.

The first loan in question was disbursed on November 21, 1990. The original note evidencing this loan was signed by Dr. Lloyd C. March (Dr. March), Mrs. March's husband, on November 21, 1990 and the funds were disbursed sometime after 2:00 p.m. on November 21.[2] Prior to her husband's signing

---

1. The Hollands are requesting relief under the Hyde Amendment and this Amendment incorporates the Equal Access to Justice Act (EAJA). There is no provision for a separate trial upon the fee application issue in either the Hyde Amendment or section 2412(b) of the EAJA. Since the purpose of both the Amendment and the Act which it incorporates is to avoid unnecessary attorney's fees and litigation costs, it is self-defeating to conduct a separate evidentiary hearing on the Application. The Hyde Amendment permits an expansion of the record under certain circumstances. While both parties have asked the Court to expand the record, neither party has advanced sufficient grounds for doing so. The Court's decisions are based upon the evidence utilized at trial, whether utilized by the Prosecution or by the defense. (For further discussion, *See* Part I Sec. H, "Expansion of The Record.")

2. At one point the Prosecution was proceeding on the assumption that the $350,000 note signed by Dr. March on November 21, 1990 was missing from the documents produced. However, the allegedly missing document was discovered among the other documents which the bank had produced by FBI case agent Robert Patterson II

of this note, Mrs. March had either signed a similar note in the wrong place or indicated her unavailability to sign such a note by November 21. However, Dr. March appeared at the bank on November 21 stating that he urgently needed $350,000 in order to exercise an option on a piece of property which he represented was essential to his development of a movie studio project. After some discussion with Holland Jr., the bank accepted Dr. March's signature on the $350,000 note and disbursed the funds to him, with the understanding that a note signed by his wife for the same amount would be substituted for his note. Since the disbursement occurred after 2:00 p.m. on November 21, it was not entered in the bank's loan ledger on that day, nor was it entered the following day as November 22, 1990 was Thanksgiving. The loan was entered on the bank's loan ledger as the first entry on November 23, 1990.

On November 27, 1990, Mrs. March signed a note in the identical principal amount of $350,000, but there was no disbursement of any funds. Instead, the original $350,000 note signed by Dr. March was marked "paid," and Mrs. March's note was backdated to November 21 to recapture six days of interest.

During the eight month period following November 1990, the bank extended the three additional loans to Mrs. March and the three separate loans to Jaffe. All seven of these loans, including the initial $350,000 loan, were similar in that each was fully documented in the bank records produced to the FDIC, and the funds from five of the loans were disbursed by cashier's checks made payable to Dr. March, while the funds from the remaining two were disbursed by cashier's check payable to Mrs. March who immediately endorsed such checks to Dr. March. These seven notes were also similar in that Dr. March directly or indirectly made interest and principal payments on certain of them and, in some cases, furnished collateral to the signatories of the notes which was in turn pledged to the bank as security for the loans. It appears from the record that the three loans to Jaffe were paid in full and that

(case agent Patterson) in a file with Dr. March's

the collateral was liquidated and applied to the four loans booked in Mrs. March's name. The record does not indicate the exact amount repaid on the four loans in Mrs. March's name, but as of August 23, 1993 the bank stated that no loss was anticipated (Def.Ex. 146, Letter from bank's attorney David H. Baris (Baris) to Helgerson of August 23, 1992 at P. 3).

Neither the FDIC nor the U.S. Attorney's investigation uncovered any evidence that the Hollands personally benefitted or sought to benefit from the seven loans in question. Indeed, in his memo of May 8, 1992, Helgerson stated "We have no evidence to document any direct financial gain by the Hollands as a result of these loan activities [loans to Mrs. March and Jaffe]." (Govt.Ex. FDIC–10, Memo from Helgerson to FDIC director, John W. Stone, of May 8, 1992 at P. 2, ¶ 2). The evidence also indicated that the Hollands jointly owned approximately 30% of the bank's stock and ultimately stood to lose this proportion of any loan losses.

Neither the FDIC's nor the Prosecution's investigation uncovered any evidence of concealment on the part of the Hollands. The chief of the team of examiners who inspected the bank was Ostrowski. In his trial testimony, Ostrowski testified that the Hollands cooperated fully in the investigation. (Trans. P.1151, L.23–25, P. 1152, L.1–7). Ostrowski also documents in his report to Helgerson the absence of evidence of concealment. (Def.Ex.136, supra).

## C. FDIC ANALYSIS OF ITS INVESTIGATION

The FDIC memos which postdated Ostrowski's January 23, 1992 report establish that it would seek to remove the Hollands from the bank and also seek civil monetary penalties and restitution against the Hollands and, perhaps, the bank, for the granting of this series of seven loans. The FDIC opined that the seven loans, when aggregated with Dr. March's pre-existing loans from the bank, violated the Virginia lending limit (lending limit) set forth in section 6.1–61 of

other paid notes.

the Virginia Code.[3] The memo of FDIC regional attorney, Richard M. Fraher (Fraher) to Richard C. Barringer (Barringer), FDIC review examiner, dated April 2, 1992 (Def.Ex.73), principally relied upon alleged lending limit violations as the basis for administrative actions against the Hollands and the bank. Fraher's memo also discussed other alternatives including a criminal referral. It is the custom for the FDIC to work with the Virginia Bureau of Financial Institutions (BFI) in conducting investigations of state chartered banks. In the course of discussions between the BFI and the FDIC, the BFI gave its opinion that the lending limit statute was not violated by the seven loans in question, since they should not be aggregated with Dr. March's prior debts for the purpose of determining whether loans to him exceeded the bank's lending limit.[4] The potential issue of whether the FDIC was bound by the BFI's opinion was not raised, but FDIC memos establish that it proceeded as if it were bound. Prior to the BFI opinion, the FDIC proposed three forms of civil administrative penalties based upon the seven loans which the FDIC had opined to be violations of the lending limit. In his memo of April 2, 1992 to the review examiner, Barringer (Def.Ex.73, supra), Fraher further stated that a criminal referral should be considered, and he went on to state "Realistically, the U.S. Attorney's office will not prosecute this kind of case energetically unless they are attracted by some non-legal consideration, such as the prominence of the respondents." *Id.* at P. 9.

However, by June 23, 1992, the FDIC knew that the lending limit "was gone" (Tr.P. 1638, L.13) as the basis for seeking civil monetary penalties and restitution from the Hollands.[5] However, as Fraher testified at trial, he "found another way to skin these cats" (Tr.P.1633, L.3) by using the criminal law as the basis for seeking civil monetary

penalties and restitution from the Hollands. He stated in his June 23, 1992 memo: "In this particular instance, using violations of criminal statutes as the basis for an administrative enforcement action raises no constitutional problem related to the double jeopardy clause, because a section 8(b)(6) action is purely compensatory, not punitive." (Def.Ex. 81, Memo from Fraher to Helgerson of June 23, 1992, at P. 3). His memo concluded with a recommendation that the FDIC initiate a criminal referral which would include all conceivable violations of Federal law. However, as Helgerson observed:

> "Reaction by the Justice Department to this criminal referral is difficult to judge. However, with the dollar amount of the loss already incurred and the identification of a Virginia State Senator as a primary suspect in the alleged criminal activity, it is probable that the referral will receive an active and timely review for possible prosecution."

(Govt.Ex. FDIC–10, at P. 3).

Shortly thereafter, in his memo of June 30, 1992, Fraher acknowledged a second development unfavorable to the FDIC's objectives. On June 25, 1992, Mrs. March prepared a statement disclaiming the content of a Grounds of Defense filed in her behalf by Attorney James R. Sheeran (Sheeran). While the bank gave her the loan identification information used in preparing her statement, it is in her handwriting and bears her signature.[6] The Grounds of Defense to which Mrs. March's statement refers was prepared and filed by Sheeran on November 1, 1991 in reply to a civil suit against her by the bank for collection of the four loans booked in her name. The Grounds of Defense denied her liability for these loans and alleged that each loan was not Mrs. March's obligation but that of her husband, Dr. March. The Grounds of Defense also alleged

---

**3.** Section 6.1–61 of the Virginia Code places limits upon amounts which are the obligation of a borrower.

**4.** (Govt.Ex. BFI–10, Letter of BFI senior counsel, William F. Schutt, to Fraher of July 28, 1992). While the BFI letter is dated July 28, 1992, FDIC memos establish that it knew of this opinion on or before June 23, 1992.

**5.** In Def.Ex. 73, supra, at P. 4–9, Fraher discusses the elements which must be proven to impose civil monetary penalties or restitution.

**6.** (Govt.Ex. FB/COR–54, at P. 3, Letter from Mrs. March to Helgerson dated June 25, 1992).

that these four loans were illegal because Dr. March and the bank induced Mrs. March to sign the notes in order to mislead bank regulators.[7] The Grounds of Defense was included in the bank's document production and commented upon in Ostrowski's initial report of January 23, 1992 and, thereafter, it was cited in numerous FDIC memos and in the indictment. At the time this pleading was filed, Sheeran was representing both Mrs. March and Dr. March. Sheeran filed a bankruptcy petition in behalf of Dr. March on November 7, 1991 which was supplemented with a schedule of his debts. Although the Grounds of Defense of November 1, 1991 (Govt.Ex.FB/LEG-8) alleged that the loans in Mrs. March's name were actually the loans of Dr. March, no mention of these four loans was made in Dr. March's schedule of debts portion of his bankruptcy filing.[8] Later Sheeran prepared and filed a bankruptcy petition in behalf of Mrs. March which listed the four loans booked in her name as her debts, (Govt.Ex.BK/JM-01), again in direct conflict with the allegations in the Grounds of Defense.

In addition to disputing the accuracy of the Grounds of Defense filed in her behalf, Mrs. March also testified that she did not discuss any allegations of fraud against her husband and the bank with her attorney (Tr.P.789, L.5–8) and she was not supplied with a copy of the Grounds of Defense by her attorney. (Tr.P.787, L.21–23). In the course of his trial testimony, Sheeran stated that he had discussed these fraud allegations with both Dr. and Mrs. March. He further testified that they had discussed and verbally waived the obvious conflict in representing Dr. March while simultaneously representing Mrs. March in a court proceeding alleging that Dr. March was guilty of fraud. (Tr.P. 894, L.11–15).

The FDIC immediately reacted to Mrs. March's disclaimer of June 25, 1992. Fraher wrote a memo to Barringer on June 30, 1992 (Govt.Ex. FDIC–15, Memo from Fraher to Barringer of June 30, 1992) in which he stated that "It is apparent that Mrs. March is lying, ..." (*id.* at P. 1). He goes on to classify the Hollands as "brazen liars" and recommends that they be examined "..., under oath, with an inquisitorial examiner ... [which] would be the best way to set the stage for setting up the presumptively hostile witnesses for impeachment to break down their credibility at a subsequent hearing." (*Id.* at P. 2). He also repeats his recommendation that a criminal referral go forward, stating:

> "Third, I believe that the FDIC should forward the criminal referral in this case under cover of a letter that formally requests prompt and serious attention from the U.S. Attorney's office. Together with the apparent violations of several Federal criminal statutes, the unflinching self-righteousness of the Hollands regarding conduct which was evidently illegal, the size of the losses which they caused to the Bank, and the appearance that they have attempted to use the influence of Mr. Holland's political position in the state government to obviate or minimize enforcement action by the Federal regulatory authority, all indicate that this case merits particular attention in the criminal forum, where a defendant's moral desserts are an appropriate issue."

(*Id.* at P. 2).

The criminal referral did go forward to the U.S. Attorney's office for the Eastern District of Virginia in July 1992, but, based upon conferences between Fraher and the chief prosecutor, it was put on hold pending developments in the FDIC's administrative pro-

---

7. (Govt.Ex. FB/LEG-8, ¶ 25, 27, Grounds of Defense filed November 1, 1991).

8. Court Ex. C is the debt schedule of Dr. March. (Although *a portion* of Dr. March's bankruptcy petition was attached to and commented upon in the Government's Hyde Amendment reply brief, the portion containing his debt schedule was neither commented upon nor attached. The Government did possess his debt schedule, how-

ever, and it was part of criminal trial exhibit Govt.Ex. BK/LM–01. But the latter exhibit was not produced to the Court until after the Government's reply brief had been filed. Because all exhibits were withdrawn when the Motion for Acquittal was granted, the Court requested that counsel file *all* exhibits utilized at trial as part of the Hyde Amendment proceedings).

ceedings (Def.Ex. 120, Letter from Asst. U.S. Attorney to Fraher of November 6, 1992).

## D. FDIC ADMINISTRATIVE PROCEEDINGS

Having placed a hold on the criminal referral, the FDIC proceeded with a formal investigation of the Hollands and the bank.

On September 19, 1992, the FDIC issued subpoenae for Holland Sr., Holland Jr., bank Vice President, Luther J. Upton III (Upton) and the records custodian for the bank. The FDIC 10c examinations under oath, (usually referred to as depositions in the record) of Holland Jr. and Holland Sr. were set for October 15 and 16, 1992, respectively. On October 2, 1992, the FDIC filed a "Notice of Charges and of Hearing" (Govt.Ex.FDIC–21) which contained allegations that the bank created nominee loans and attempted to deceive Federal and State regulators by false pretenses.[9]

Counsel for the bank requested a postponement of the Hollands' depositions as well as a postponement of the date fixed for the production of documents. The postponement requests cited the need for the Hollands to review bank documents in preparation for their depositions, and the belief that such review was complicated by the simultaneous document production. The bank also indicated that eight employees had worked eighty hours on the production and they had only been able to locate about 25% of the documents sought. The FDIC first denied and then granted an extension for the document production until November 3, 1992. (Def.Ex. 105, Letter from Rubin to bank's attorney, Baris, of October 6, 1992). However, the FDIC refused to postpone the depositions of Holland Jr. and Holland Sr. Further, the FDIC advised counsel for the bank, Baris, that he had no right to be present during the examinations of the Hollands, since representing them as individuals would conflict with his representation of the bank.

The depositions of Holland Jr. and Holland Sr. were taken on October 15 and 16 as scheduled. The bank's attorneys filed its answer to the Notice of Charges on October 28, 1992 (Govt.Ex.FDIC–22). The documents requested of the bank were produced on or about November 3, 1992. The FDIC then pursued administrative remedies against the Hollands and the bank. On February 5, 1993, the FDIC reached a "Settlement of Pending and Potential Enforcement Actions" (Settlement Agreement) with the Hollands and the bank. (Def.Ex. 145, Settlement Agreement of February 5, 1993 and Def.Ex. 167, Order to Cease and Desist incorporated in the Settlement Agreement). The major points of the Settlement Agreement were, first, that Holland Sr. permanently resign his position as chief executive officer of the bank on or before December 31, 1993; second, that Holland Sr. immediately cease participation in the bank's lending functions, except in his capacity as a director; and, third, that the bank and its board of directors comply with the Order to Cease and Desist incorporated in the Settlement Agreement. On or about February 5, 1993 the Settlement Agreement was signed by Helgerson for the FDIC and the Hollands and all other bank directors except one. Included in the Settlement Agreement was the following language: "The Regional Director further agrees that, if any recommendations for further proceedings against the bank or any of its institution-affiliated parties have been made to Washington on or before the date of this agreement, such recommendations will be withdrawn upon the effectiveness of this Agreement." (Def.Ex. 145, Settlement Agreement of February 5, 1993, at P. 2). On February 8, 1993, the FDIC conducted another examination of the bank which, from the record, appeared very favorable. (Def.Ex. 146, Letter from bank's attorney, Baris, to Helgerson of August 23, 1993 at P. 3). The record does not disclose any further action by the FDIC or any activity by the U.S. Attorney's office until after the FDIC's receipt of Baris' letter of August 23, 1993. (Def.Ex.146). Citing improvements in bank policies and performance, Baris requested in this letter that the FDIC rescind the Settlement Agreement requirements that Holland Sr. resign as CEO and limit his

---

**9.** The BFI observed that it had not been deceived nor had evidence been concealed from it. (Govt.Ex. BFI–12, letter of October 9, 1992 from Sidney A. Bailey to Helgerson).

participation in the bank's loan functions. The record does not contain any response by the FDIC. However, having settled the civil administrative proceedings against the bank and the Hollands on February 5, 1993, in September 1993, approximately seven months later, it requested the U.S. Attorney's office to reopen the criminal investigation which had been dormant for almost a year.

## E. THE TWO GRAND JURIES

On or before July 20, 1994, the U.S. Attorney initiated the first grand jury investigation. A second grand jury apparently was convened in 1996 or early 1997.[10] It does not appear that the U.S. Attorney's investigation or the grand jury proceedings yielded any new evidence.[11] All of the factual and documentary evidence relied upon by the Prosecution was in existence and known by the FDIC prior to the administrative settlement date of February 5, 1993. With the possible exception of FDIC-related opinion witnesses, all witnesses called by the Prosecution with reference to the events surrounding the seven loans were known to the FDIC prior to the settlement date. Also, the grand jury testimony utilized at the trial was the same evidence available to the FDIC before the February 5, 1993 settlement.

## F. THE INDICTMENT

Four years after the U.S. Attorney reopened its investigation, on September 26, 1997 the grand jury returned a thirty-one count indictment, which included twenty-eight charges against Holland Sr. and twenty-nine charges against Holland Jr. The Department of Justice's *Criminal Resource Manual*, (Aspen) Section 9–2.164 Suppl. (1993), provides:

> 9–2.164 Number of Counts in Indictments. In order to promote the fair administration of justice, as well as the perception of justice, all U.S. Attorneys should charge in indictments and informations as few separate Counts as are reasonably

necessary to prosecute fully and successfully and to provide a fair sentence on conviction. To the extent reasonable, indictments and informations should be limited to fifteen Counts or less, so long as such a limitation does not jeopardize successful prosecution or preclude a sentence appropriate to the nature and extent of the offenses involved.

Dept. of Justice Manual: *Criminal Resource Manual.*

Counts Two and Three charged both defendants with a violation of Title 18, U.S.C. § 1005 & 2. Count Two charged an attempt to deceive the FDIC based upon the note signed by Dr. March on the afternoon of November 21, 1990 which was not booked until November 23, 1990. Count Three charged a violation of the same statutes based on the November 27, 1990 note signed by Mrs. March and booked as her loan. Her note was backdated to November 21, 1990 and substituted for the note of the same date signed by Dr. March. Count Four charged intent to deceive the FDIC by booking the November 27, 1990 note as the obligation of Mrs. March. Counts Twenty–Six, Twenty–Seven, Twenty–Eight, Twenty–Nine and Thirty–One were also based upon these two notes. Counts Twenty–Three, Twenty–Four, Twenty–Five and Thirty were all based, in part, on these two notes and, in part, on the six additional notes signed by Mrs. March and Jaffe. Thus, a total of twelve counts were based in whole or in part on these two notes.

Counts Five, Six and Seven were all based upon a loan to Jaffe by note dated December 6, 1990. Count Five charged the defendants with a false entry to deceive the FDIC by booking this note in the name of Jaffe instead of Dr. March. Count Six, relying upon the same statute as Count Five, charged both defendants with making a false entry to deceive the FDIC by preparing a commercial loan worksheet in the name of Jaffe instead of Dr. March. The two counts are identical

---

10. The exact terms of the grand juries are not in the record, but the grand jury testimony of Dr. and Mrs. March utilized at trial establishes that two grand juries were convened.

11. Case agent Patterson did *rediscover* the November 21, 1990 note signed by Dr. March (See FN2 at P. 3 of this Opinion.)

except Count Five charged a false entry in booking the loan and Count Six charged a false entry in preparing a commercial loan worksheet for the same loan. (Indictment of September 26, 1997). Mirror images of Counts Five and Six are repeated in Counts Ten and Eleven in reference to a $150,000 loan to Jaffe on February 2, 1991; repeated in Counts Thirteen and Fourteen in reference to a $100,000 loan to Mrs. March dated March 14, 1991; repeated in Counts Sixteen and Seventeen in reference to a loan of $24,-000 to Mrs. March on April 26, 1991; and, finally, repeated in Counts Nineteen and Twenty in reference to a $50,000 loan to Jaffe on July 8, 1991. Count Four is also a mirror image of Count Six, except Count Four relates to the loan evidenced by the note signed by Mrs. March on November 27, 1990. Count Eight is also a mirror image of Count Five, except that Count Eight related to a loan in the sum of $325,000 by note of Mrs. March dated February 1, 1991.

Counts Seven, Nine, Twelve, Fifteen, Eighteen and Twenty–One are mirror images of each other in charging both defendants with *defrauding the bank* by the misapplication of funds. Each of these six counts is separately directed at each of the remaining six loans. Count Twenty–Two charged Holland Jr. with making a material false statement to the FDIC when he answered "none" to the following request: "List all extensions of credit made since the last examination for the accommodation of others than those whose names appear on the bank's records or on credit instruments in connection with such extensions." (Indictment, Count 22). Count Twenty–Three charged both defendants with misleading the FDIC by the false representation that the Grounds of Defense filed by Sheeran was incorrect. Count Twenty–Five charged both defendants with a violation of the same statutes based upon essentially the same conduct. Count Twenty–Four charged both defendants with misleading the FDIC in stating that the bank "... ceased lending funds to Dr. March once he had reached our lending limit."

Counts Twenty–Six and Twenty–Seven charged Holland Jr. with perjury and obstruction of justice respectively based upon his testimony in the FDIC deposition that he could not remember a $350,000 loan of November 21, 1991 to Dr. March. Counts Twenty–Eight and Twenty–Nine charged Holland Sr. with the same offenses based upon his testimony that there was only one disbursement of $350,000 in the time frame of November 21, 22 and 23 and that he had no personal knowledge of a loan of $350,000 to Dr. March. Counts Thirty and Thirty–One charged both defendants with material false statements with respect to the bank's Answer to the FDIC Notice of Charges signed and filed by the bank's attorneys. Count Thirty charged a false statement with respect to the following: "Farmer's Bank denies that it has extended credit by creating nominee loans, and denies that it intended in any way to mislead or deceive regulatory authorities by false pretenses or otherwise." Count Thirty–One charged the same misconduct with respect to responses indicating that the bank lacked information to admit or to deny certain facts relating to the November 21, 1990 loan to Dr. March.

Count One aggregated the alleged misconduct contained in Counts Two through Thirty–One and concluded with the allegation that Holland Sr. and Holland Jr. thereby conspired with themselves "and others" to violate the statutes which are the subject of the substantive counts.

## G. THE JANUARY 6, 1998 HEARING

On October 31, 1997, the defendants filed several motions. Certain of these motions were resolved between counsel and other motions were heard on January 6, 1998. Among the motions heard was a request for a bill of particulars by the defendants. The Court granted this motion in part insofar as it required the Prosecution to identify the known co-conspirators referred to in the indictment's boilerplate language as "conspired with ... other persons not named herein as defendants, both known and unknown to the grand jury." On January 9, 1998, the Government identified the unnamed co-conspirators "known and unknown to the grand jury" as Dr. Lloyd C. March, Jr. and two attorneys for the bank. On March 27, 1998, five working days before trial, the Prosecution moved

to amend its designation of unnamed co-conspirators to add bank Vice President Upton. The Government conceded that the purpose of adding him as a co-conspirator was to facilitate the admission of a hearsay statement which would otherwise be inadmissible.[12] The Court denied this request by the Government.

The defendants also filed a motion to disqualify Sheeran from continuing to represent Dr. and Mrs. March with respect to their trial testimony. The motion was based in part upon alleged conflicts regarding Sheeran's pleadings and testimony and also upon his representation of Dr. and Mrs. March simultaneously. Attorney Sheeran filed a one-page pleading in opposition to the defendants' motion, and this pleading constituted the only appearance of the Marches before the Court except in the capacity of trial witnesses. While the Court denied this motion, it expressed its disapproval of the nature of Sheeran's representation of the Marches. Shortly thereafter, the Marches discharged Sheeran as their attorney.

## H. EXPANSION OF THE RECORD

In reaching its FINDINGS, the Court has relied upon the testimony at the criminal trial and all documents and exhibits utilized by the Prosecution and Defense at trial whether formally admitted or not. By agreement of counsel, all exhibits were withdrawn following the Court's granting of the Motion for a Judgment of Acquittal. However, when the Hyde Amendment Application was later filed, the Court called upon counsel to reconstruct the exhibits, and counsel have stipulated to the exhibits admitted in evidence. The Court also requested the parties to supply each document and exhibit utilized in the examination of witnesses including exhibits offered at trial but not admitted, and they have stipulated to these as well.

1. Hollands' Request to Expand the Record.

■ The Hollands requested an opportunity to expand the record to include evidence which they claim would have been presented in their defense had their motion for acquittal not been granted. This request creates a substantial problem for the Court. If such evidence was not known by the FDIC or by the Prosecution, it is not material to the FDIC's decisions to request or reopen the criminal referral or to the decision to prosecute.

Even if the Hollands take the extra step and prove that their proposed defense evidence was known to or should have been known to the FDIC or to the Prosecution, the FDIC and the Prosecution are not bound by conflicting evidence presented by the defense.[13] Accordingly, the Court DENIES the Hollands' Request to conduct an evidentiary hearing on their Hyde Amendment Application.

2. The Government's Request to Expand the Record.

■ The Government attempted to expand the record firstly by citing the grand jury testimony of witnesses it opted not to call at trial. Secondly, the Government requested the Court to consider affidavits which were prepared *after* the trial. The Government made this request despite the fact that the Court had specifically advised it during the May 29, 1998 telephonic hearing that neither form of evidence would be permitted. However, in the May 29, 1998 hearing, the Court invited the Government to submit any internal memos or documents prepared *before* the trial which memorialized the Prosecution's pre-trial assessment of the case.

The defendants' evidence was submitted in the form permitted by the Court's ruling, and they moved to strike the Government's post-trial affidavits and portions of the grand jury testimony. First, with respect to the grand jury testimony, the Court must infer that the most favorable witnesses and grand jury testimony (except classified, in-

12. April 3, 1998, Transcript of Motions, P. 8, L13 to P. 11, L. 20.

13. While the Court relies upon Defendants' Exhibits and certain witness' grand jury testimony,

all exhibits relied upon were known to the FDIC and Prosecution before indictment and, of course, the grand jury testimony utilized at the criminal trial was known to the Prosecution.

formant or undercover) were utilized at the criminal trial,[14] and that the Prosecution weighed the issue of which witnesses to call and what grand jury testimony to cite during the examination of its witnesses. There is no suggestion that classified, informant or undercover evidence exists, and the Court therefore DENIES the Government's request to expand the record by introducing portions of the grand jury testimony of witnesses who did not testify at the criminal trial.

Secondly, the post-trial affidavits present a myriad of problems. One of these is best illustrated by reference to the Government's treatment of attachments to its brief in opposition to the Hyde Amendment Application filed June 26, 1998. In its brief the Government states that Dr. March made periodic interest payments on notes in Mrs. March's name and the Prosecution attached *selected* portions of his bankruptcy schedules as evidence of that fact. The existence of such payments was not in dispute at trial, and this attachment standing alone does support the inference that the loans in Mrs. March's name were actually those of Dr. March. However, the Prosecution failed to comment upon the exculpatory evidence that Dr. March's schedule of debts in his bankruptcy filing did not include the four loans booked in Mrs. March's name or the fact that Mrs. March listed these four loans as her own in her separate bankruptcy debt schedules.[15] Further, the Prosecution omitted from the attachments to its June 26, 1998 brief that portion of Dr. March's bankruptcy filing which included his debt schedules, nor did it attach Mrs. March's debt schedules.

This selective submission upon an important issue raises a question of whether evidence may have been withheld from the affiants or purposefully omitted from the affidavits. Not only did the Court advise the Government in advance that it would

not accept after-the-fact affidavits, it also invited the submission of any pre-trial documents memorializing the very conferences relied upon by the affiants in their affidavits. At oral argument, the Prosecution admitted that such documents existed, but cited prosecutorial privilege to shield them from production.[16]

Assuming that this privilege exists in a Hyde Amendment proceeding, the question arises as to why the Prosecution chose to assert privilege as to its pre-trial documentation of such conferences, while attempting to bootstrap its argument with affidavits relying upon post-trial characterizations of the same conferences. The Court DENIES the Government's request to expand the record to include the after-the-fact affidavits. By denying both Government requests, the Court GRANTS the Hollands' motion to strike the Government's attempted expansion of the record. Further, should the Court have admitted the post-trial affidavits, their persuasive value is entirely outweighed by the inferences which arise from the Government's failure to produce the contemporaneous documentation of the conferences.

## PART II. PROCEDURAL ISSUES ARISING IN THE APPLICATION OF THE HYDE AMENDMENT

The Hollands' Application is based upon the Hyde Amendment:

*Award of attorney's fee and other expenses where position of United states is vexatious, frivolous, or in bad faith.* Act Nov. 26, 1997, P.L. 105–119, Title VI, § 617, 111 Stat. 2519, provides: " 'During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act, may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litiga-

---

**14.** The Court is not privy to what portions of the grand jury testimony were disclosed to the defense before trial.

**15.** While the Government filed no bankruptcy debt schedules with its response to the Hyde Amendment Application, the debt schedules were in its criminal trial exhibits and furnished to the

Court in response to its request of July 30, 1998 (Govt.Exs. BK/LM–01 and BK/JM–01).

**16.** The Court need not consider the prosecutorial privilege asserted to support the Government's withholding of such documents as it merely invited but did not order their production.

tion expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code. To determine whether or not to award fees and costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal. Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by appropriation. No new appropriations shall be made as a result of this provision.' "

The Court must determine which section or sections of the Equal Access to Justice Act, 28 U.S.C. section 2412 (EAJA) apply to the Hollands' Application through its incorporation in the Amendment. This Amendment does not refer to either EAJA section 2412(b) or section 2412(d) specifically, but generally incorporates section 2412.

 Several courts have addressed the Hyde Amendment in published opinions, one finding "the language of the statute is unambiguous" *U.S. v. Reyes*, 16 F.Supp.2d 759 (S.D.Tex.1998); *see also United States v. Troisi*, 13 F.Supp.2d 595 (N.D.W.Va.1998); *United States v. Ranger Electronic Communications*, 22 F.Supp.2d 667 (W.D.Mich. 1998); *United States v. Gardner*, 23 F.Supp.2d 1283 (N.D.Okla.1998).[17] The Government and the Hollands agreed at oral argument that neither the Hyde Amendment nor the EAJA as incorporated was ambiguous as applied to this Application, although each interpreted the statute somewhat differ-

ently. It is this Court's duty to interpret statutes as meaning what they say, unless there is some obvious ambiguity. *Id., Reyes*, 16 F.Supp.2d at 760. The Court FINDS no obvious ambiguity in the Hyde Amendment or in the EAJA as applied to the Hollands' Application. Accordingly, " 'there is generally no need for a court to inquire past the plain language of the statute.' " *Id.* (Quoting *United States v. Ron Pair Enterprises*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). While the Government asserts that the Amendment incorporates all of the procedures and limitations of section 2412(d) of the EAJA for all Hyde Amendment Applications, at the time of the Amendment's passage case law allowed parties claiming attorney's fees under the EAJA to elect whether to proceed under section 2412(b) or under section 2412(d). *See Hyatt v. Shalala*, 6 F.3d 250 (4th Cir.1993) (recognizing that there are two distinct methods for a district court to award attorney's fees under the EAJA); *American Hosp. Ass'n v. Sullivan*, 938 F.2d 216, 219 (D.C.Cir.1991) (noting that since the party seeking attorney's fees was ineligible under section 2412(d) it could seek fees under section 2412(b)). Subsection 2412(b) provides:

> Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States.... The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

Had Congress intended to limit an applicant's rights to those granted by section 2412(d), it could have said so. There is no reason to believe the Hyde Amendment intended to confer lesser rights upon criminal defendants than the EAJA conferred upon civil litigants.[18]

---

**17.** While several cases discuss the section 2412(d) limitations, none of these cases analyze a section 2412(b) application under the Hyde Amendment.

**18.** The legislative history of the Hyde Amendment is sparse. As originally drafted, the Hyde Amendment appeared to track section 2412(d) of the EAJA in that it required the United States to

■ Decisions in civil cases under the EAJA have found that parties who elect to proceed under section 2412(b) are not subject to the procedures and limitations of section 2412(d). (*Hyatt,* 6 F.3d at 254; *Sullivan,* 938 F.2d at 219). The Court FINDS that Hyde Amendment applicants in criminal cases may make the same election as civil litigants may make in claims under the EAJA and, accordingly, the Hollands may proceed under section 2412(b), free of section 2412(d) limitations.

Section 2412(b) applies in situations where "the common law or a statute specifically provides for such an award," and the Hyde Amendment meets the description of such a statute. It, therefore, unambiguously permits a Hyde Amendment Application pursuant to section 2412(b). Section 2412(b) contains its own limitations which provide that the court may award such fees: "(1) to the prevailing party; (2) against the United States or its agents; and that (3) the United States shall be liable ... to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award."

Absent disqualification based upon asset totals, a civil applicant for fees and costs would arguably face an easier road to recovery under subsection 2412(d). The Government argues that Hyde's reference to "procedures and limitations" necessarily refers solely to section 2412(d) or refers to section 2412(b) merged with section 2412(d) because the Government asserts that only section 2412(d) contains procedures and limitations.

In section 2412(d), several limitations appear including: (1) the costs must be *incurred* by the prevailing party other than the United States, which has been interpreted to mean that the prevailing party must have personally paid the fees. *See United States v. Paisley,* 957 F.2d 1161, 1164 (4th Cir.1992);[19] (2) the Court must find that the position of the United States was not substantially justified; (3) the hourly fee cannot be in excess of $125 "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee"; and (4) an individual who is a prevailing party cannot have a net worth exceeding $2,000,000 at the time the action was filed. The only procedural requirement included in the EAJA is found in section 2412(d), which requires that parties must submit their application for fees within 30 days of final judgment in the predicate action.

■ In a civil case under section 2412(d), the United States has the burden to prove, presumably by a preponderance of the evidence, that its position was substantially justified. *United States v. Yoffe,* 775 F.2d 447, 450 (1st Cir.1985); *Lundin v. Mecham,* 980 F.2d 1450, 1459 (D.C.Cir.1992). However, the attempted application of section 2412(d) to a Hyde Amendment criminal case may raise ambiguities. For example: (1) where the Amendment uses the terms "vexatious," "frivolous," and "in bad faith," is this terminology to be substituted for "substantial justification" in explanation of the phrase

prove that its prosecution was substantially justified. (143 Cong.Rec. H8229–02, H8243). However, in its final form, the Hyde Amendment omitted the substantial justification standard and revised the burden of proof via the requirement of proof that the prosecution was vexatious, frivolous, or in bad faith. Such a change could be interpreted as an indication that the Amendment, in its final form, would allow defendants to proceed under section 2412(b).

The legislative history accompanying the original bill manifested an intent to give criminal defendants the same rights as successful civil litigants. When he introduced the Amendment in Congress, Rep. Hyde stated: "Now it's occurred to me, if that is good for a civil suit, why not for a criminal suit ... In that circumstance,

as in the Equal Access to Justice Act for civil litigation, you should be entitled to your attorney's fees reimbursed and the costs of litigation." 143 Cong.Rec. H7786–04, H7791.

On balance, the legislative history seems to favor a criminal defendant having the same right to elect to proceed under section 2412(b) as a civil litigant, however, this Court need not consider this issue since it does not find the applicable statutes ambiguous.

19. Since the Court is ruling that section 2412(b) of the EAJA applies, it does not FIND that *Paisley* applies to this Application for criminal attorney's fees and litigation costs, as section 2412(b), unlike section 2412(d) does not use the key phrase "... incurred by that party...."

"(but not the burden of proof)"; or (2) does the phrase "(but not the burden of proof)" mean that the United States' burden of proof shifts to the applicant in a Hyde Amendment claim; or (3) does it mean both?[20] That is, does vexatious, frivolous and bad faith displace substantial justification and also shift the burden of proof to the applicant? Thus, the requested reliance upon section 2412(d) may raise ambiguities which do not exist when applying section 2412(b). The Court FINDS that the Hollands have properly elected to proceed under section 2412(b), that they bear the burden of proof by a preponderance of the evidence, and that they are not subject to the procedures and limitations contained in section 2412(d).

## PART III. APPLICATION OF THE HYDE AMENDMENT TO THE FACTS IN THE RECORD

### A. THE ELEMENTS OF THE HYDE AMENDMENT APPLICATION

The Hyde Amendment may be analyzed as containing nine elements. The first five elements are easily decided.

First, the Court FINDS that the defendants' case was pending "on . . . the date of the enactment of this Act" that is, November 26, 1997.

Second, the Court FINDS that this case was a criminal case in that the Hollands were charged with thirty-one Federal felony violations.[21]

Third, the Court FINDS that the defendants were not represented by "assigned counsel paid for by the public."

Fourth, the Court FINDS that the defendants were prevailing parties.

Fifth, The Court FINDS that the prevailing party was not the United States.

The sixth element requires the Hollands to prove that the FDIC or the Prosecution was vexatious, frivolous or in bad faith, and this element is the subject of further analysis.

The parties have stipulated as to the seventh element which is the reasonableness of the attorney's fees and litigation costs from January 6, 1998 until the hearing upon the Hyde Amendment Application of August 19, 1998. This stipulation is commented upon in Part V of this Opinion and Order.

The eighth element requires the court to identify the agency (or agencies) over which the Hollands have prevailed for the purpose of fixing liability for the fees and other expenses. This element is analyzed in Part VI of this Opinion and Order.

The ninth element enables the Court to deny an award if special circumstances make such an award unjust. The Court FINDS that no special circumstances have been proven.

### B. DEFINITION OF VEXATIOUS

■ In determining whether the FDIC criminal referrals or the Prosecution was vexatious, the Court must first look to the definition of the term. In defining this term, the Court FINDS that words, "unless otherwise defined, will be interpreted as taking their ordinary, contemporary, common meaning," *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). According to Merriam–Webster,[22] "vexatious is

---

**20.** Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code . . ." [Portion of Hyde Amendment].

**21.** The Prosecution argues that the "criminal case" language limits any recovery of attorney's fees and costs to those incurred after indictment, as criminal rights are typically triggered only when a criminal case is instituted, i.e. at the time of arrest, issuance of a summons, the filing of an information or the issuance of an indictment. *See Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). While the Court agrees with the Government's position on this

issue, it is not material here as the Court FINDS that the defendants have not established that the Prosecution's conduct was "vexatious, frivolous or in bad faith" until January 6, 1998 which was subsequent to the return of the indictment. Although the misconduct of the FDIC primarily occurred before indictment, the Court will treat the FDIC in the same manner as the Prosecution as this Court FINDS the agencies acted in concert.

**22.** While there is evidence of bad faith on the part of the FDIC, such evidence is insufficient to prove bad faith. Further, the Hollands, in oral argument, abandoned their bad faith claim. When the FDIC's investigation revealed a bank

defined as 'causing or likely to cause vexation . . . lacking justification and intended to harass.'" "Vexation" is defined as "agitation, annoyance . . . harassment by process of law." [23] Any prosecution usually "causes or is likely to cause . . . agitation or annoyance," and the Court FINDS that to be the case here. Therefore the Court's analysis will focus upon whether the prosecution was "lacking justification . . . intended to harass . . . and harassment by process of law."

■ Based upon this definition, the test applicable to this Application is whether the Hollands have proven that a reasonable FDIC decision-maker and a reasonable Prosecutor knew or should have known that the criminal referrals and the continued prosecution were "lacking justification . . . intended to harass . . . and harassment by process of law." In weighing the evidence, the Court must practice restraint,[24] and view such evidence through the eyes of a reasonable FDIC official and a reasonable Prosecutor and not through hindsight.

## C. FINDINGS

The Court FINDS that the Hollands have proven that the totality of the FDIC conduct which led to its criminal referrals was vexatious. Although the FDIC determined it had insufficient evidence to impose further penalties or to remove Holland Jr. when it settled

its civil administrative enforcement proceedings, it nonetheless requested the reopening of the criminal referral in September 1993 following the bank attorney's request for modification of the Settlement Agreement.

The Court further FINDS that the Hollands have proven that their prosecution by the U.S. Attorney's office for the Eastern District of Virginia, with the assistance of the Department of Justice and FDIC attorneys, became vexatious as of the close of the January 6, 1998 hearing. The Court FINDS that the FDIC and the Prosecution acted in concert from the time of the original criminal referral in July of 1992 until the completion of the trial on April 16, 1998. The vexatious conduct of the FDIC largely occurred prior to January 6, 1998, indeed, it largely occurred before indictment. However, had the prosecution been terminated as of January 6, 1998, it is questionable whether the FDIC's prior vexatious conduct would have been actionable under the Hyde Amendment. Accordingly, both agencies are found liable as of January 6, 1998. The Hyde Amendment provides that fees and other expenses ". . . shall be paid by the agency over which the party prevails." As the Court FINDS the FDIC and the U.S. Attorney's office acted in concert beginning with the original criminal referral in July 1992, it further FINDS the Hollands prevailed over both agencies.[25]

---

with a lending limit in the area of $1.8 million, making loans to Dr. March, Mrs. March and Jaffe totaling over $2.5 million in related transactions, its decision to proceed further does not meet the dictionary definition of frivolous. This term is defined by *Merriam–Webster's New International Dictionary*, 1993 Ed. (Merriam–Webster) as "of little weight or importance; having no basis in law or fact . . . light, slight, sham, irrelevant, superficial." While this Court does FIND that the FDIC criminal referrals had no basis in law or fact, it does not FIND that the FDIC criminal referrals and the prosecution were "of little importance" or "irrelevant or superficial."

23. *Blacks Law Dictionary*, 1990, defines "vexatious" as "without reasonable or probable cause or excuse." The Court FINDS that reliance upon this definition would yield the same result.

24. As stated above, the Court must "practice restraint when reviewing prosecutorial decisions. '[C]ourts normally must defer to prosecutorial decisions as to whom to prosecute.' *Newton v. Rumery*, 480 U.S. 386, 396, 107 S.Ct. 1187, 1193,

94 L.Ed.2d 405 (1987). The Supreme Court has recognized, 'Because [prosecutorial] decisions are not readily susceptible to the kind of analysis the courts are competent to undertake,' we have been 'properly hesitant to examine the decision whether to prosecute.' *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 607–608, 105 S.Ct. 1524, 84 L.Ed.2d 547, . . . (1985))." *U.S. v. Reyes*, 16 F.Supp.2d 759, 761 (S.D.Tex.1998) The Court FINDS that similar restraint applies to its analysis of FDIC conduct. However, the enormous power invested in prosecutors and government agencies may not go entirely unchecked, as the Hyde Amendment illustrates in criminal prosecutions and the EAJA illustrates in civil litigation.

25. *See United States v. Gardner*, 23 F.Supp.2d 1283 (N.D.Okla.1998) (finding that the "position of the United States" includes the activities of the "agency" involved in the matter and is not limited to the position taken by the Department of Justice.)

An important link in the chain of evidence tying the FDIC proceedings to the prosecution is found in the testimony of the FBI's principal case agent and Prosecution's trial representative, case agent Patterson. He was the Prosecution's first witness. In response to cross-examination by counsel for Holland Jr. regarding when and why the long-dormant criminal investigation was reopened, case agent Patterson testified with a remarkable degree of candor: "Mr. Sims, if this [the FDIC formal investigation] had been resolved satisfactorily through the administrative enforcement proceeding, the criminal referral would never have gone forward." (Tr.P.268, L.25, P. 269, L.1–2).

Belatedly, case agent Patterson attempted to backtrack when responding to the next question:

"Q. . . . the FDIC was using the criminal referral to force what it wanted to do in the civil administrative proceeding, isn't that right?

3. I have no idea, sir. That was never conveyed to me."

(Tr.P.269, L.3–6).

At no time during the criminal trial or during the Hyde Amendment proceedings did the Prosecution attempt to clarify or explain case agent Patterson's testimony. The Court FINDS that this testimony directly links the prosecution of the Hollands to the FDIC's self-proclaimed failure to accomplish its objectives through civil administrative enforcement proceedings. However, the Court does not FIND that the FDIC and the Prosecution acted vexatiously for precisely the same reasons and, accordingly, this Or-

der and Opinion will analyze the findings separately as to each agency.

## PART IV. ANALYSIS OF THE FINDINGS

### A. VEXATIOUS CONDUCT OF THE FDIC

In determining whether the conduct of the FDIC was vexatious, the test should be whether the conduct of the FDIC decision-makers in requesting the criminal referral and in requesting its reopening in late 1993 was vexatious. Thus, the Hollands have the burden of proving by a preponderance of the evidence that either or both of these actions by the FDIC was vexatious.

The Court FINDS that the Hollands have met this burden of proof for several reasons: first, the evidence is clear that the initiating and reopening of the criminal referral were motivated by impermissible considerations; second, the Court FINDS that the FDIC used the "in terrorem" threat of criminal prosecution and attendant publicity to unduly influence the settlement of the administrative action; third, the Court FINDS that the FDIC impermissibly used the criminal referral as a substitute for its self-proclaimed unsuccessful civil administrative proceedings against the Hollands.[26]

As to the first finding, on at least four occasions the FDIC documented that it would have to rely upon considerations other than the evidence in promoting the criminal prosecution of the Hollands. First, on April 2, 1992, in a memo to Richard C. Barringer, Fraher opined that the U.S. Attorney's office would not prosecute the case unless there was some non-legal consideration to motivate them, such as the prominence of the Hol-

---

**26.** If the Court determined that the FDIC used the threat of criminal prosecution to impose civil monetary penalties or restitution, such conduct may be an abuse of process. *See e.g. Donohoe v. Burd*, 722 F.Supp. 1507, 1521 (S.D.Ohio 1989) ("It is a well recognized principle that the use of criminal process in the court system in an effort to collect a civil debt will support an action for abuse of process"). A criminal prosecution is intended to bring a person who has committed a crime to justice and not to aid in the collection of a civil debt. *Id.* The Court notes that the FDIC's reopening of the criminal referral could be found analogous to abuse of process or the misprision of a felony. Case agent Patterson testified that

the criminal referral would not have been reopened by the FDIC and acted upon by the Prosecution if the FDIC had achieved its objectives regarding the Hollands. Misprision of a felony has long been against public policy. *Dirks v. Securities Exchange Commission*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). "A person cannot condition his transmission of information of a crime on a financial award." *Id.* The fact that the prosecution occurred some time later may be mitigating evidence as to abuse of process and misprision of a felony, but the laws' condemnation of the FDIC's conduct is consistent with this Court's finding of vexatious conduct on its part.

lands. (Govt.Ex. FDIC–10, paraphrasing of quote on P. 6 of this Opinion and Order). Secondly, in his memo of May 8, 1992 to the FDIC director, Helgerson stated:

"Reaction by the Justice Department to this criminal referral is difficult to judge. However, with the dollar amount of the loss already incurred and the identification of a Virginia State Senator as a primary suspect in the alleged criminal activity, it is probable that the referral will receive an active and timely review for possible prosecution."

(Govt.Ex. FDIC–10 at P. 3).

Thirdly, in his memo of June 30, 1992 to Barringer, Fraher repeats his recommendation to forward the initial criminal referral which should include advising the U.S. Attorney's Office of "... the appearance that they have attempted to use the influence of Mr. Holland's political position in the state government to obviate or minimize enforcement action by the Federal regulatory authority, ..." (Gov.Ex. FDIC–15 at P. 2). The Prosecution offered no evidence in support of the FDIC's conclusory allegation of political corruption. The FDIC opined that it needed a "non-legal" or political reason to promote the prosecution of the Hollands, and it vexatiously attempted to manufacture this political charge to support the criminal referral.

Fourthly, the FDIC investigation in issue was commenced precisely one month after Helgerson received a letter from Holland Jr. which was directly critical of the FDIC generally and critical of Helgerson personally. The Court FINDS that the timing and excessive nature of the FDIC's later actions were based, at least in part, on this letter. The Court FINDS that the prominence of the defendant, Holland Sr., as a Virginia State Senator, the unsupported assertion that he used his political position to hinder the FDIC proceedings, and the Holland Jr. letter were each "non-legal" and impermissible grounds for the FDIC to have relied upon in initiating and in reopening the criminal referral. The Court further FINDS that the FDIC relied upon these grounds in preparing the original

criminal referral in approximately July of 1992 and again in reopening the criminal referral in approximately September of 1993.

The Court further FINDS that the FDIC impermissibly utilized the criminal law to support its objective to impose civil monetary penalties and restitution upon the Hollands. When the FDIC learned that it could no longer rely upon a violation of the Virginia lending limit as a basis for civil administrative remedies, it intentionally utilized criminal statutes in order to subject the defendants to the same punishment. Throughout the proceedings, the FDIC's objectives included ousting the Hollands, particularly Holland Sr., from any position of responsibility at the bank, imposing civil monetary penalties upon the Hollands and requiring restitution by the Hollands. The FDIC was only able to accomplish a portion of the first of these objectives in the Settlement of Potential Enforcement Actions reached with the bank and the Hollands on February 5, 1993. Neither the Settlement Agreement nor the Cease and Desist order which it incorporated, required the payment of any civil monetary penalties by anyone or required any form of restitution by anyone. The agreement did require that Holland Sr. immediately cease participation in lending decisions, except as a director, and that he resign as chief executive officer no later than December 31, 1993. He was allowed to remain as a director even after this date. The Settlement Agreement required no other change in senior management at the bank, and approved the continued service of Holland Jr. as president. (Def.Ex.145, Supra).

It appears that this settlement put an end to the entire matter as it apparently was intended to do,[27] and should have done. The proceedings against the Hollands began as civil administrative actions and should not have progressed beyond civil proceedings. There is no evidence of further action by the FDIC or the United States Attorney's office until the FDIC received the bank attorney's letter of August 23, 1993. (Def.Ex.146). This letter referenced a number of positive

---

27. See provision of the Settlement Agreement stating all recommendations for further proceedings against the bank and its institution-affiliated parties would be withdrawn. (Def.Ex. 145, Settlement of Pending and Potential Enforcement Action signed February 5, 1993 at P. 2).

ratios based upon the FDIC's February 8, 1993 examination of the bank and also recited additional favorable developments. However, the letter also sought Helgerson's permission to reinstate Holland Sr. as CEO. Holland Sr. had been the primary target of the administrative proceedings and the FDIC's response to the bank's request was to make its own request that the dormant criminal referral be reopened. This conduct brought to the forefront the FDIC's attempted substitution of criminal prosecution for unsustainable civil administrative remedies, as case agent Patterson testified.

This misuse of the criminal law began when the Virginia Bureau of Financial Institutions ("BFI") advised the FDIC that the loans to Jaffe and Mrs. March could not be aggregated with the loans of Dr. March for purposes of determining a violation of the Virginia lending limit. (Govt.Ex.BFI–10). When the FDIC learned that it could not rely upon a Virginia lending limit violation, in Fraher's words "we found another way to skin these cats." (Tr. p. 1633, L.2–3). As Fraher testified, the lending limit "was gone" (Tr. p. 1638, L.13) as a basis for civil monetary penalties and restitution. However, as he further stated, "As soon as the Sec. 6.1–61 [Virginia Lending Limit Statute] went away, I started to look for another legal theory that would support the same actions that we had put on the table before." (Tr. p. 1637, L.3–5). Holland Jr.'s attorney then asked Fraher:

"Q. But the legal theory you decided to use was to switch from civil law to criminal law, wasn't it?

A. No, sir. We don't do criminal prosecutions and it turned out it was one heck of a debate as to whether we use criminal statutes to support our civil enforcement procedure."

(Tr.P.1638, L.4–8).

However, prior to the initial criminal referral, the FDIC had already relied upon criminal statutes to support its civil objectives as enunciated in Fraher's memorandum of April 16, 1992:

"... this draft CMP [Civil Monetary Penalty] notice includes a recitation of every criminal violation that could be charged against the respondents [the Hollands]. Typically the FDIC does not in its pleading of enforcement cases rely on criminal statutes, leaving criminal violation for the Department of Justice to prosecute, in those rare instances when justice deigns to indict."

(Def.Ex. 74, P. 2–3, Memo of April 16, 1992 from Barringer to Fraher). He added:

"This draft is crafted to maximize the *in terrorem* impact of the threat of a CMP [civil monetary penalty] action. Therefore, I have set up the pleading to state an action for Tier 2 CMPs. This reflects a purely tactical decision for purposes of negotiation only, based on my perception that the Respondents greatly fear the prospect of negative publicity concerning their violations of law."

(*Id.* at P. 2).

Later in the memo he states:

"Thus the attached pleading exists primarily for the purpose of showing the Respondents how nasty things could get if they refuse to negotiate a settlement of the case."

(*Id.* at P. 3).

When two important, but unfavorable, developments occurred, the FDIC's response was to "shoot the messenger." When the Virginia Bureau of Financial Institutions opined that the seven loans in question did not violate the Virginia lending limit, Fraher made accusations of political corruption against Holland Sr. and the then director of the BFI. When Mrs. March denied the accuracy of the Grounds of Defense, Fraher branded her a liar. Fraher's memo of June 30, 1992 (Govt.Ex.FDIC–15) repeated his recommendation that "... the FDIC should forward the criminal referral in this case under cover of a letter that formally requests prompt and serious attention from the U.S. Attorney's office." (*Id.* at P. 2). This memo also discusses using a section 10c examination under oath to *set up* the Hollands for impeachment. Indeed, the Prosecution later used these 10c depositions against the Hollands for the far more serious purpose of indicting them for perjury and obstruction of justice.

First, the Court FINDS that the FDIC impermissibly relied upon the political standing of Holland Sr. and potentially unfavorable publicity to promote and supplement its initial and subsequent criminal referral. For similar reasons, the Court further FINDS that the FDIC vexatiously used alleged criminal violations and the threat of associated publicity as an "in terrorem" threat in unduly influencing the Hollands to settle the administrative proceedings. Finally, the Court FINDS that case agent Patterson correctly observed that the FDIC requested the reopening of the criminal referral following the August 23, 1993 letter requesting Holland Sr.'s reinstatement, because of its self-proclaimed failure to accomplish its objectives through civil administrative proceedings.

The FDIC primarily directed its efforts toward punishing the Hollands instead of protecting the bank deposits or the bank's capital structure. As the former director of the Virginia Bureau of Financial Institutions observed: "It is my firm opinion that effective remedial measures for the deficiencies in this bank probably were available earlier but, in apparent preference for an adversarial approach, were rejected by the FDIC when suggested by the [BFI] Bureau." (Govt.Ex. BFI–12, Letter from Bailey to Helgerson of October 9, 1992 at P. 2).[28]

## B. VEXATIOUS PROSECUTION

In determining whether the Prosecution was vexatious, the test applied by the Court is whether a reasonable prosecutor should have concluded that the applicable law and the available evidence were insufficient to prove the defendants' guilt beyond a reasonable doubt and, if so, was the continuation of the prosecution vexatious. The Prosecution's conduct was a corollary of the FDIC's vexatious use of criminal proceedings to accomplish its civil administrative enforcement objectives. Conversely, the Prosecution possessed no evidence of criminal conduct, and it relied on evidence of civil wrongdoing, in the form of alleged unsound business practices and lending limit violations, as the basis for the criminal prosecution. There was sufficient evidence to raise an inference of unsound business practices or lending limit violations, but this is evidence of civil wrongdoing not criminal conduct. In other words, the Hollands were accused of criminal conduct based principally upon the age-old mistake of throwing good money after bad. Administrative penalties were imposed for this civil wrongdoing as outlined in the Settlement Agreement, and the evidence at indictment and the criminal trial never rose above the level which the FDIC agreed justified no more than lower level civil penalties.

As to the multiple counts charging perjury, false statements and obstruction of justice, there was no evidence of a false statement of fact. When the bank booked a loan in the name of Mrs. March or Jaffe, as opposed to Dr. March, it was merely interpreting the transaction differently than the FDIC or the Prosecution. The defendants' interpretation of how to book the loan is not a false factual statement because the FDIC and the Prosecution opine that it should have been booked differently.[29] The same reasoning applies to the allegedly false statements in the FDIC forms which the Prosecution attributes to the Hollands.

Armed only with evidence which the FDIC deemed insufficient to accomplish its civil administrative objectives, the Prosecution presented the case to the tribunal having the lowest burden of proof, the grand jury. The Government argues in its opposition to the Hollands' Application for pre-indictment attorney fees and litigation costs that the U.S. Attorney's actions did not constitute a criminal case until indictment. The Court agrees. It follows that the passage of the Hyde Amendment imposes the same restraint on prosecutors and government agencies in criminal cases as the EAJA imposes upon the government in civil cases. A grand jury

---

28. The Government's brief argues that this letter was relied upon by the Court in its granting of the Motion to Acquit. In fact, during the criminal trial the Court sustained the Prosecution's objection to this proposed exhibit. However, the Court considers the exhibit admissible and persuasive evidence in this proceeding.

29. *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir.1998).

finding of probable cause and this Court's pre-trial finding of probable cause upon limited issues in *In re Grand Jury Proceedings, John Doe, U.S. v. Under Seal,* 102 F.3d 748 (4th Cir.1996) do not preclude a Hyde Amendment recovery.[30] If the grand jury finding of probable cause barred this Application, the Hyde Amendment would be a nullity.

The Settlement Agreement specifically approved Holland Jr's continued services as bank president, yet he was indicted for twenty-nine felonies based on the same evidence available to the FDIC when it approved his continued service. The Court FINDS that the indictment of Holland Jr. on twenty-nine counts was the Prosecution's version of the FDIC's "in terrorem" proceedings intended to show his father, Holland Sr., "just how nasty things could get." (Def.Ex.73, P. 3).

The Government argues in its brief that the Court erred in excluding a number of items of evidence at the criminal trial. However, this argument misses the mark. For purposes of the Hyde Amendment Application, the test is whether there was sufficient evidence upon which a reasonable prosecutor should have proceeded. The fact that the Court ruled certain evidence inadmissible does not mean that the Prosecution could not have reasonably relied upon such evidence in its decision to prosecute. While the Court granted the defendants' Motion for a Judgment of Acquittal as to all counts, it does not automatically follow that the prosecution of each count was vexatious. For example, the Court FINDS that a reasonable prosecutor could have concluded that there was a sufficient basis in law and evidence to support bringing Count Twenty–Two to trial.[31]

However, the greater weight of all of the evidence compels the FINDING that the Prosecution became vexatious not later than the January 6, 1998 hearing. There are three primary reasons for this FINDING. First, in indicting the defendants, the Prosecution relied upon evidence which it knew the FDIC deemed insufficient to pursue civil monetary penalties and restitution from the Hollands, notwithstanding the higher burden of proof required to convict the defendants of criminal offenses. While the Prosecution was not legally bound by the FDIC's analysis, it should have known that evidence of unsound business practices or lending limit violations was not sufficient proof of criminal conduct.

Secondly, the Court FINDS that the Prosecution obviously had insufficient evidence upon which to find or infer the specific criminal intent which is an element of each count. There is no evidence that the Hollands benefitted or sought to benefit from any of the questioned loans, or that any records of these loans were concealed. The depositions of the Hollands and the forms filed in behalf of the bank contain no factually false statements regarding the names in whom the loans were booked, and the Prosecution's choosing to classify such statements as false merely represents its interpretation of the bank records.[32] However, even if prima facie evidence of the falsity of the defendants' statements was available, their cooperation and the production of all relevant documents by the bank and the defendants negate any evidence of intent to mislead the FDIC or the bank.

The Prosecution had only three witnesses available to prove criminal intent: Dr.

---

**30.** The Conference Report on the Hyde Amendment notes "The conferees understand that a grand jury finding of probable cause to support an indictment does not preclude a judge from finding that the government's position was vexatious, frivolous, or in bad faith." H.R.Conf.Rep. 105–405 at Section 617. Courts have noted that one of the criticisms of the grand jury system is that a grand jury is too often a "rubber stamp" for a prosecution. *See e.g., Fields v. Soloff,* 920 F.2d 1114, 1118 (2nd Cir.1990); *United States v. Sears, Roebuck and Co., Inc.,* 518 F.Supp. 179, 188 (C.D.Cal.1981).

**31.** The Court's reasons for acquitting the defendants on Count Twenty–Two are discussed in more detail in Part IV under the heading "Count Twenty–Two."

**32.** Similarly, the Fourth Circuit has noted that in the defamation context: "'... When a speaker plainly expresses a subjective view, an interpretation, a theory, conjecture or surmise, rather than [a] claim to be in possession of objectively verifiable false facts, the statement is not actionable.'" *Biospherics, Inc.,* 151 F.3d at 186, *quoting Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir.1993).

March, Mrs. March and Sheeran. While the Prosecution presented several bank employees and FDIC officials as trial witnesses, this witness testimony only served to corroborate or comment upon documents produced by the bank.

There are a number of reasons why the Prosecution should not have relied upon the testimony of any of these witnesses. With respect to the key Grounds of Defense, the Prosecution knew that Sheeran's testimony would conflict with that of his clients, Dr. and Mrs. March. In fact, it was the FDIC which first suggested Sheeran be disqualified from representing them in the FDIC formal investigation, and he consented to this suggestion for a period of time. In addition to the various conflicts in his pleadings and representation, there is evidence that he had his own agenda *vis a vis* the Hollands.[33]

The Government argues that Sheeran's testimony alone was sufficient to establish a prima facie case against the Hollands. If his testimony regarding the Grounds of Defense met the minimum standards of credibility, this argument may have had merit as to Counts Twenty–Three, Twenty–Five and, perhaps, Thirty. However, for the reasons discussed in this Opinion and particularly in the section analyzing Counts Twenty–Three and Twenty–Five, the Court FINDS that Sheeran's testimony regarding the accuracy of the Grounds of Defense was so seriously inconsistent internally and irreconcilably in conflict with indubitable documentary evidence [the conflicting pleadings he had filed], that his testimony regarding the Grounds of Defense was incredible as a matter of law.[34]

While the unexplainable inconsistencies between the Grounds of Defense and the bankruptcy debt schedules could have been recognized when Dr. and Mrs. March filed their bankruptcy petitions approximately six years earlier, the January 6, 1998 hearing should have unmistakably exposed these conflicts to a reasonable prosecutor. Following this hearing a reasonable prosecutor should have known that the Grounds of Defense and Sheeran's testimony regarding it were completely discredited and the Prosecution was left with only Dr. and Mrs. March as potential witnesses upon the issue of criminal intent.

At this point, if not sooner, the prosecution of all counts, with the possible exception of Count Twenty–Two, should have been terminated. The Prosecution knew the Marches' testimony would be favorable to the Hollands. The Government's suggestion that the Marches, particularly Mrs. March, did a "180" at the trial is disingenuous. The FDIC had previously branded Mrs. March a liar when she disputed the accuracy of the Grounds of Defense on June 25, 1992, and her grand jury testimony largely supported her written statement.[35] In order for Dr. March to support the Prosecution's case, he would have been required to admit his participation with the Hollands in a scheme to defraud the bank and its regulators. Although immunized, Dr. March never admitted to such conduct. Mrs. March's testimony never supported an inference that she had knowledge of a scheme to defraud by the defendants and her husband, and the Prosecution was forced to rely upon the Grounds

---

**33.** "Q. Did you tell Jeff Gray that you would do everything within the bounds of truthful testimony to see the Hollands went to jail?

A. That's not how—that's not how the conversation went, and that was not my statement.

Q. Who made the statement to whom?

A. Jeff Gray said to me on the telephone, 'You'd say anything to put the Hollands in jail.' And I was surprised by that statement. I paused for a moment, and I said, 'I will not say anything that isn't truthful.'" Tr.P. 922, L. 12–21.

**34.** *See, Winchester Packaging, Inc. v. Mobil Chemical Co.,* 14 F.3d 316, 319 (7th Cir.1994); *Stewart v. RCA Corporation,* 790 F.2d 624, 628 (7th Cir.1986) ("A court might be able to find a witness incredible as a matter of law ... if the current story were irrefutably contradicted by documentary evidence.")

**35.** At the trial the Prosecution extensively cross-examined Dr. and Mrs. March based upon their grand jury testimony, and successfully raised potential conflicts with their trial testimony. However, when defense counsel examined them upon their grand jury testimony, it became apparent that the Prosecution had very carefully utilized selected portions of the transcript while omitting numerous unfavorable passages. Given the background of the FDIC's assessment of the Marches as witnesses, a reasonable prosecutor should not have relied upon them as favorable witnesses for the Prosecution's case.

of Defense filed by Sheeran in its attempt to attribute this knowledge to her. Accordingly, when the Grounds of Defense was finally and completely discredited on January 6, 1998, the Prosecution's meticulously crafted case collapsed, and the Court FINDS that the continued prosecution of all fifty-seven charges against both defendants after this date was vexatious.[36]

Thirdly, the Court FINDS that the Prosecution again followed the "in terrorem" policy of the FDIC when it obtained an indictment containing thirty-one counts. As case agent Patterson testified, there never would have been an indictment if the civil administrative proceedings had been resolved satisfactorily to the FDIC. The Prosecution expanded seven questioned loans and the bank's response to the FDIC's questions into fifty-seven criminal charges, twenty-eight against Holland Sr. and twenty-nine against Holland Jr. The duplications in and excessiveness of the indictment violate the Department of Justice's own guidelines.[37] It should also be noted that the U.S. Attorney's office consumed four years and two grand juries between the reopening of the criminal referral in September 1993 and the indictment on September 26, 1997.

The twenty-nine counts against Holland Jr. are the most difficult to comprehend. Early-on the FDIC concluded that Holland Sr. was primarily responsible for the seven questioned loans and for all other actions of the bank. In his report of January 23, 1992, Ostrowski stated:

> While the records appear clear in their documentation of the circumvention, they unfortunately fall short in their ability to show precisely who the officer of record was on these loans. During the exit meeting, President Richard J. Holland, Jr. was asked who the loan officer was on these credits. His response was that it would have been either him or his father. However, Chairman Richard J. Holland is the only officer who had the legal authority to

grant most of the individual credits. Additionally, it has been well noted throughout the years that Chairman Holland wields the reigns [sic] of power in this bank and that no event takes place without his knowledge or approval. Accordingly, it is recommended that civil money penalties be assessed against Chairman Holland, for willfully circumventing State law. It is also recommended that civil money penalties of lesser amounts be assessed against President Richard J. Holland, Jr. for aiding in this circumvention of the lending limit and to the board of directors for creating the loose atmosphere which allowed this violation to occur.

(Def.Ex. 1136 at P. 3)

Holland Sr.'s alleged dominance of the bank's activities was repeatedly commented upon by the FDIC.[38] Importantly, the FDIC deemed Holland Jr. suitable to continue to serve as the bank president without hiring additional management support as of the February 5, 1993 settlement. The Court FINDS that the duplications and excesses in the indictment and in the charging of Holland Jr. with twenty-nine felonies were designed to place both defendants in the "in terrorem" state previously envisioned by the FDIC.

While the Court FINDS both the Prosecution and the FDIC liable under the Hyde Amendment as of January 6, 1998, there are two subsequent incidents which corroborate the Prosecution's routine practice of vexatious conduct in this criminal case. First, on March 26, 1998, the Prosecution sought to enlarge the designation of co-conspirators which it had filed on January 9, 1998 by adding bank vice president Upton as an additional co-conspirator. An analysis of this request establishes that it was not made because he actually was a co-conspirator, but because a hearsay statement which he made would not be admissible against the defendants unless he was designated as and prov-

---

**36.** While the continued prosecution of Count Twenty–Two against Holland Jr. was, in itself, not vexatious, the totality of the Prosecution's conduct was vexatious.

**37.** *See* Part I, Section F., "The Indictment."

**38.** "Holland, Sr. is a domineering individual who clearly dictates decisions to his son and the Board." (Govt.Ex. FDIC–10, supra at P. 2, ¶ 3.)

en to be a co-conspirator.[39] The Prosecution admitted its purpose at trial, in spite of the undisputed fact that the FDIC investigation exonerated Upton[40] and the Government's trial testimony indicated that Upton opposed the granting of the November 21, 1990 loan.

In the second incident, the Prosecution deliberately attempted to mislead the Court with reference to expert witness testimony which related to Count Twenty–Two. The details of this attempt are included in the analysis of Count Twenty–Two. The Court FINDS that the Prosecution deliberately added definitions and opinion evidence through its edited disclosure of expert testimony presented to the Court at the close of trial on April 15, 1998 (Court Ex. B), in direct contradiction of its representation that it would "cut down" or "strike" portions of its earlier disclosure (Court Ex. A.). Thus, the Prosecution's zeal to convict outweighed any respect for the evidence or Upton's reputation and led to an attempt to mislead the Court. When viewed as a part of the continuing course of conduct of the prosecution of the case, such conduct was vexatious.

Although the Court explained its granting of the defendants' Motion for a Judgment of Acquittal as to each count from the bench and in its Opinion filed April 30, 1998, the test for finding the Prosecution vexatious differs from the standard applied to acquittal. Accordingly, each count will be analyzed and subjected to the applicable test.

## C. COUNTS TWO, THREE AND FOUR

In Count Two the Prosecution charged that the Hollands intentionally made a false entry by withholding the posting of the November 21, 1990 loan to Dr. March in the bank's loan ledger until November 23, 1990. However, the loan proceeds were disbursed after 2:00 p.m. on the banking day of November 21, 1990 and November 22 was Thanksgiving; therefore, November 23 was the first opportunity to post this loan and it was post-

ed as the first entry on the loan ledger for that date. The Prosecution conceded after resting its case that it had no evidence to support Count Two. The FDIC was in possession of these facts in 1992 and the "missing note" of November 21, 1990 was found by case agent Patterson among the documents produced by the bank on November 3, 1991 in a folder with Dr. March's other paid notes. Accordingly, the Prosecution was in possession of the evidence relating to Count Two before the indictment, but it sought an indictment on this count and it did not abandon this obviously unsupportable charge until after presenting its trial evidence.

Counts Three and Four are both based on the note signed by Mrs. March on or about November 27, 1990 and backdated to November 21. Count Three charged a material false entry based upon booking this note in the bank records as a loan to Mrs. March. Count Four charged a material false entry in a commercial worksheet booked in the name of Mrs. March with respect to the same loan. It is difficult to justify two separate felony counts based upon the same statute where the only distinction is entry of the information on a note as in Count Three and entry on a commercial loan worksheet as in Count Four. Even more disturbing is the fact that the Government repeated this duplicative charging separately with respect to five of the remaining loans in question.

The record establishes that this note signed by Mrs. March was substituted for the note of her husband, Dr. March, and Dr. March's original note was marked "paid" and placed in a separate file with his other paid notes. Further, there was no disbursement of $350,000 to anyone following the signing of this note by Mrs. March. Instead, the proceeds were credited in full payment of the earlier note signed by Dr. March on November 21. The key elements of Counts Three and Four were (1) the making of a material false entry; and (2) making such entry with the intent to deceive the FDIC.[41] The Prosecution presented no evidence to support ei-

---

**39.** Upton suffered a loss of memory in an automobile collision, however, this fact was known to the Prosecution well before it originally identified the co-conspirators on January 9, 1998.

**40.** "Upton has not been implicated as an active participate in granting the illegal loans." (Govt.Ex. FDIC–10, supra at P. 2, ¶ 2.)

**41.** See 18 U.S.C. § 1005 "Whoever makes any false entry in any book, report or statement of

ther element. The entries do not become materially false by virtue of the Prosecution's attempt to classify them as such. Throughout the FDIC proceedings and the prosecution, the defendants took the position that the loans were properly booked in the name of the person signing the note and their interpretation was supported by senior counsel for the Virginia Bureau of Financial Institutions.[42] Accordingly, what the Prosecution sought to classify as a material false statement of fact was nothing more than a disputed interpretation of documents previously produced by the defendants.[43] Even if the Prosecution had satisfied its burden of proving that the entries constituted materially false facts, they presented no evidence of an intent to deceive the FDIC.[44] It is not disputed that both notes, the paperwork which accompanied each of them and the disbursement information were made available to the FDIC. An analysis of the intent element must again begin with the recognition that there was no evidence of any benefit to the Hollands. Accordingly, by what evidence could the Prosecution prove the requisite intent without proof of concealment? Not only did the record reveal that all relevant documents were produced to Ostrowski during his initial investigation, but Ostrowski himself testified that the Hollands fully cooperated with the investigation.

Accordingly, the Court FINDS that no reasonable prosecuting attorney could have found that there was sufficient evidence to support Counts Two, Three and Four, and the Court further FINDS that the Prosecution acted vexatiously in prosecuting these Counts.

### D. COUNTS FIVE, SIX, EIGHT, TEN, ELEVEN, THIRTEEN, FOURTEEN, SIXTEEN, SEVENTEEN, NINETEEN AND TWENTY

Counts Five and Six track Counts Three and Four. Count Five charged both defen-

dants with making a false entry to deceive the FDIC by booking the loan in Jaffe's name; Count Six charged them with preparing a commercial loan worksheet in Jaffe's name. Count Eight is a mirror image of Count Five, except that it refers to another of the seven questioned loans. For unexplained reasons, there was no mirror image of Count Six charged with respect to the February 1, 1991 loan of $325,000. However, mirror images of Counts Five and Six are charged with respect to the four remaining loans in Counts Ten, Eleven, Thirteen, Fourteen, Sixteen, Seventeen, Nineteen and Twenty. For the same reasons that the Prosecution had no evidence of a material false statement of fact or an intent to deceive the FDIC with respect to Counts Three and Four, it had no evidence with respect to the counts which charged mirror image offenses under the identical statutes. Not only are these charges unsupported by the law or evidence, they are duplicative and violate Department of Justice guidelines. The Court FINDS that the Prosecution acted vexatiously in prosecuting these Counts.

### E. COUNTS SEVEN, NINE, TWELVE, FIFTEEN, EIGHTEEN AND TWENTY-ONE.

The vexatious nature of the indictment is apparent when analyzing Counts Seven, Nine, Twelve, Fifteen, Eighteen and Twenty-One, where both defendants are charged in separate counts with the misapplication of bank funds with the intent to injure or defraud the bank. Two of the elements of this offense are outlined in *Devitt, Blackmar*, Sec. 30.03, as follows:

"... Three: The defendant embezzled or willfully misapplied the moneys, funds or credits of the bank;

---

such bank with intent to defraud such bank ... or to deceive ... the Federal Deposit Insurance Corporation."

**42.** See Govt.Ex. BFI–10, Letter of BFI senior counsel to Fraher of July 28, 1992.

**43.** *Biospherics,* 151 F.3d at 186. If opinions and interpretations are not actionable in a civil defa-

mation proceeding, they cannot be criminal conduct as alleged in the instant indictment.

**44.** *See United States v. Duncan,* 598 F.2d 839, 858 (4th Cir.1979); *United States v. Caldwell,* 544 F.2d 691, 696 (4th Cir .1976). Such intent is an element.

Four: The defendant did so with the intent to injure or defraud the bank; ..."

While personal gain is probably not always an element of this offense,[45] its absence is powerful evidence of a lack of intent. The undisputed evidence before the prosecution established that no gain to the Hollands was indicated and that no evidence had been concealed. The Prosecution nonetheless undertook to prove that the Hollands, the second and third generation of their family involved in the bank's management, willfully misapplied bank funds with the intent to defraud a bank in which they were cumulatively 30% owners. In other words, the indictment charged the Hollands with the intent to defraud themselves. The Court FINDS that these counts are vexatious on their face.

### F. COUNT TWENTY–TWO

Count Twenty–Two requires detailed analysis as it was potentially the Prosecution's soundest charge. It was based on the following request and response:

Request by FDIC: "List all extensions of credit made since the last examination for the accommodation of others than those whose names appear on the bank's records or on credit instruments in connection with such extensions."

Response by bank: "None."

This request and response were contained in an FDIC form signed by Holland Jr. in behalf of the bank. Had the Prosecution proven that the seven questioned loans were "accommodation loans" and that they were understood as such by the FDIC and in the banking industry, it may have been able to prove a prima facie case that the response "none" should have been understood by Holland Jr. to be a false statement. However, the Prosecution presented no definition of accommodation.

On March 26, 1998, the Prosecution filed its initial disclosure of expert witness testimony in accordance with F.R.C.P. Rule 16(a)(1)(E). At trial, the defendants objected to the Prosecution's initial disclosure of expert testimony and, in preparation for the hearing on their objection, the Court reviewed the Prosecution's initial disclosure. On April 13, 1998, which was the fifth day of trial, the Court advised the Prosecution that it was concerned with the lack of a definition of "accommodation" in the FDIC form as well as a lack of a definition of this term in the Prosecution's initial disclosure of expert testimony. (Tr.P. 971, L. 20–25 and P. 972, L. 18–25). The FDIC Notice of Charges (Govt.Ex.FDIC–21), the FDIC internal memos and the indictment repeatedly referred to the seven loans in question as "nominee loans," not as "accommodation loans." The Prosecution's initial disclosure failed to define either term or the relationship between these two terms.[46] In response to the defendants' objections to the disclosure, the Prosecution offered to "cut down" or "strike" portions of its initial disclosure for the purpose of eliminating extraneous materials. (Tr.P. 1691, L. 14–25 to P. 1692, L. 1–4). Instead of "cutting down" or "striking" portions of its initial disclosure, the Prosecution submitted an edited disclosure which undertook to define accommodation and opine that accommodation loans are also known as nominee loans.

The Court conducted a hearing in the absence of the jury in order to rule upon the defendants' objections to the proposed expert witness testimony. During the hearing, the Prosecution's expert witness admitted that the edited disclosure (Court Ex. B) contained opinions which the initial disclosure (Court Ex. A) did not. (Tr.P. 1745, L. 6 to P. 1747, L. 25). The Court thereupon sustained the defendants' objections to the opinions which the Prosecution sought to add through its edited disclosure on the grounds that the defendants had no opportunity to prepare for the new opinion testimony. At this point, the

---

**45.** *United States v. Thomas,* 610 F.2d 1166, 1174 (3rd Cir.1979); *United States v. Gallagher,* 576 F.2d 1028, (3d.Cir.1978); *United States v. Blackwood,* 735 F.2d 142, 145–46 (4th Cir.1984) (an intent to cause pecuniary injury to the bank must be proven).

**46.** Other than in Count Twenty–Two, which quoted the FDIC request and response in issue, Count Thirty–One is the only count to use the term "accommodation loan." Elsewhere in the indictment the seven loans are classified as "nominee loans."

Prosecution elected not to call its expert as a trial witness and thereby abandoned any effort to question the expert upon his initial disclosure of March 26, 1998, "Government's Disclosure of Expert Witness Information." (Court Ex. A) The Court, therefore, did not rule upon the admissibility of that portion of the expert testimony which was disclosed in the timely filed initial disclosure. In the absence of a definition of this term in the FDIC form and in the trial evidence, there was no basis for the Court to determine that "accommodation's" common and ordinary usage [47] established that Holland Jr. knowingly made a false statement.

However, the Court does not FIND that the legal and evidentiary basis for Count Twenty–Two was so lacking that a reasonable prosecutor could not have pursued it. The Prosecution's March 26, 1998 disclosure of expert testimony was timely and, while not defining accommodation, did contain an opinion that the seven questioned loans were "accommodation loans." While the Prosecution elected not to offer or proffer this expert testimony at trial, given the evidence regarding the FDIC form and the content of the initial expert disclosure, its reliance upon this count was not vexatious. However, the Court FINDS that the Prosecution's conduct in attempting to add definitions and opinions to its initial disclosure, when it had represented that it would merely "cut down" or "strike" portions of the initial disclosure, corroborates the evidence of its earlier course of vexatious misconduct.

### G. COUNTS TWENTY–THREE & TWENTY–FIVE

Count Twenty–Three charged both defendants with a material false statement in a written response to the FDIC. This count relied upon the following language appearing in the Grounds of Defense of November 1, 1990, which Attorney James R. Sheeran (Sheeran) filed in behalf of Mrs. March (Govt.Ex. FB/LEG–8).

"Mrs. March is not liable to pay the debts evidenced by any of the notes sued upon because they are illegal in that they were the debts of Lloyd C. March, Jr., but were,

with the knowledge of the bank, put in her name to mislead bank regulators."

Count Twenty–Five charged both Hollands with making material false statements for the purpose of influencing the FDIC by forwarding Mrs. March's disclaimer of the Grounds of Defense to the FDIC. This charge was based upon the same statute as Count Twenty–Three and relied on essentially the same conduct.

The bank denied the accuracy of the Grounds of Defense and its denial is the basis for both counts. In weighing the reasonableness of the Prosecution's reliance upon the Grounds of Defense, the following facts were available to it.

Sheeran represented both Dr. March and Mrs. March beginning in approximately August 1991. The Grounds of Defense was filed on November 1, 1991, and contained the language quoted in the indictment.

Mrs. March wrote a letter of June 25, 1992 (Def.Ex.84A) and repeatedly testified before the grand jury in 1994 and in 1996 that the loans were her obligation, thereby contradicting the Grounds of Defense. (Oct. GJ–JM at P. 8, 14, 15; Sept. GJ–JM at P. 11; *but see* Oct. GJ–JM at P. 22, where she stated the Grounds of Defense was "more or less" true and accurate. However, she was not shown the Grounds of Defense when questioned before the grand jury nor was she asked specifically about the alleged fraud committed by the bank and her husband).

As early as 1992, the FDIC itself raised Sheeran's conflict of interest in representing Dr. and Mrs. March in the FDIC proceeding, since his testimony conflicted with his clients'. At that time, he temporarily ceased representing them in the FDIC proceedings, while admitting he contradicted his own clients' testimony. (Sheeran's July 9, 1996 Grand Jury testimony in *United States v. John Doe* ("GJ–JS") at 63–64). However, Sheeran resumed his representation of both Dr. and Mrs. March with regard to their grand jury appearances, notwithstanding the same conflicting testimony which caused his withdrawal from the FDIC proceedings. His

---

**47.** *Perrin,* 444 U.S. at 42, 100 S.Ct. 311.

representation continued through the time of indictment and until shortly after the January 6, 1998 hearing.

In representing Dr. and Mrs. March before the Bankruptcy Court beginning in 1991, Sheeran drafted pleadings listing the four loans in Mrs. March's name as her obligations. (Govt.Ex. BK/JM–01). The loans were not listed as Dr. March's obligations even though the Grounds of Defense stated that the same loans were fraudulent and therefore were his obligation. In his July 9, 1996 grand jury testimony in *United States v. John Doe* before this Court, Sheeran further testified that his client, Dr. March, had provided false financial statements to the bank. (GJ–JS at P. 22–25).[48]

The Court FINDS that a reasonable prosecutor should not have relied upon the Grounds of Defense as the basis for a felony charge against the defendants. A reasonable prosecutor should not have turned a blind eye to the obvious conflicts in the pleadings filed by Sheeran, or ignored the obvious conflict in representing both Dr. and Mrs. March, or representing them while offering testimony in conflict with theirs. After Sheeran's conflicts were openly exposed in the defendants' October 31, 1997 motion to disqualify, and heard in court on January 6, 1998, the Court FINDS that the Prosecution's continued reliance upon the Grounds of Defense as evidence of any criminal wrongdoing was vexatious.

## H. COUNT TWENTY–FOUR

Count Twenty–Four charged both defendants with making false material statements for the purpose of influencing the FDIC. Count Twenty–Four relied upon the phrase "ceased lending funds to Dr. March once he had reached our lending limit," which is contained in the bank's Answer of May 6, 1992 to the FDIC investigation which began December 9, 1991 (Govt.Ex. FB/ME–12). If the Hollands were truthful in denying any recall of the November 21, 1990 loan to Dr. March, there is no evidence that the statement is false. As will be discussed in more detail

with respect to Counts Twenty–Six, Twenty–Seven, Twenty–Eight and Twenty–Nine, there is no evidence to suggest they did remember. As previously noted the BFI found, and the FDIC acquiesced in its finding, that the seven questioned loans would not be aggregated with Dr. March's other loans for purposes of computing the Virginia lending limit.

The November 21 loan to Dr. March requires specific analysis as it technically placed Dr. March over the bank's lending limit for a period of six (6) days. However on November 27, 1992 Mrs. March did sign a $350,000 note which was backdated to November 21, 1992 and recorded as full payment of Dr. March's original $350,000 note. It is also important that FDIC chief investigator Ostrowski "forgot" it had Dr. March's November 21 note, and this note was not rediscovered until the grand jury proceeding when case agent Patterson found it in a folder with Dr. March's other paid notes.

The November 21, 1990 note signed by Dr. March was also noted in Ostrowski's "line notes" from the December 9, 1991 FDIC investigation. When the defendants' sought production of these "line notes," they were told the notes had been destroyed. However, they were later found and produced. Accordingly, this count, as well as Counts Twenty–Six, Twenty–Seven, Twenty–Eight and Twenty–Nine were based upon allegations that the Hollands gave false information or perjured themselves when they did not remember the same note which the FDIC itself forgot.

The evidence indicated that Holland Jr. handled the November 21 transaction with Dr. March. Even if one or both of the defendants remembered this transaction, the undisputed evidence establishes that it was the bank's intention to ask Mrs. March to sign the note and book the loan in the name of Mrs. March, and the fact that it was handled in this manner is further evidence that the statement was not knowingly and willfully false.

---

48. An excerpt of Sheeran's grand jury testimony in *U.S. v. John Doe,* is included in the Record as Court Ex. D and the Court's memorandum opinion in *U.S. v. John Doe,* is included as Court Ex. E.

Even if the evidence of falsity was sufficient, all of the loans in question were documented in the bank records produced to the FDIC, negating any intent to knowingly or willfully mislead the FDIC.

The lack of evidence to support Count Twenty–Four is so obvious that the Court FINDS that the prosecution of this count was vexatious.

## I. COUNTS TWENTY–SIX, TWENTY–SEVEN, TWENTY–EIGHT & TWENTY–NINE

Count Twenty–Six charged Holland Jr. with perjury when testifying on October 15, 1992 that he could not remember the $350,-000 loan to Dr. March on November 21, 1990. Count Twenty–Eight charged Holland Sr. with the same offense, based on his October 16, 1992 testimony that there was only one disbursement of $350,000 in the time frame of November 21, 22 and 23, 1991, and that he had no personal knowledge of a loan in that amount to Dr. March. These allegedly perjurious statements were made in the course of examining the Hollands under oath in the FDIC 10c "depositions" of October 15 & 16, 1992.

While rare, it is possible to prove a perjury charge based upon an accused's testimony that he did not remember some fact or event. The Prosecution's missing evidence was the element that the defendants knowingly made false statements. It bears repeating that the loan to Dr. March, which is the basis for the perjury charges as well as the obstruction charges, was intended to be made to Mrs. March. In addition, by the time of the FDIC depositions in October 1992, the $350,000 note signed by Dr. March had been marked paid in full and filed with his paid loans for almost two years. The substitute $350,000 loan was booked by the bank as a loan to Mrs. March from November 27, 1990 (although the note was backdated to November 21, 1990) until well beyond October 16, 1992. In fact, Ostrowski, who located and commented upon the note in his "line notes," testified at trial that he *forgot* the note while

in attendance during the Holland depositions. (Tr. P. 1160, L.9–16).

In addition, the FDIC denied the Hollands the opportunity of postponing their depositions for the purpose of reviewing the bank documents, an issue which was specifically discussed in the Holland Jr. deposition. In those cases where defendants have been successfully prosecuted for perjury based upon a statement to the effect of "I don't remember" there has been other evidence sufficient to support an inference that the defendant did remember.[49] There is no evidence before the Court to support such an inference. Further, the alleged perjurious statements could not be considered material to the FDIC since it had possession of Dr. March's note and both $350,000 notes were fully documented in the records produced by the bank.

Counts Twenty–Seven and Twenty–Nine charged Holland Jr. and Holland Sr. with obstruction of justice based on the same statements which were the basis for the perjury charges. While the element of "a knowing and material false statement" is also an element of "obstruction of justice," these counts require an additional element. The phrase "I don't remember" could not have obstructed or been intended to obstruct the due administration of justice, since complete records of the loans and disbursements were produced by the bank. Again, the note which the defendants could not remember was produced to the FDIC on November 3, 1992 and the existence of the loan was regularly booked in the bank records. Accordingly, the Court FINDS that the lack of evidence to support the charges of perjury and obstruction of justice is so obvious that the Prosecution's pursuit of these four counts was vexatious.

## J. COUNTS THIRTY & THIRTY–ONE

Counts Thirty and Thirty–One were both based upon an alleged material false statement in the bank's answer (Govt.Ex. FDIC–22) to the FDIC Notice of Charges (Govt.Ex. FDIC–21). First, it should be noted that the defendants are at least once-removed from the statements in that the subject statements

49. *United States v. McMahon*, 938 F.2d 1501, 1510 (1st Cir.1991); *United States v. Morales*, 815 F.2d 725, 749 (1st Cir.1987); *United States v. Clizer*, 464 F.2d 121 (9th Cir.1972).

charged in both counts were allegations in the "Answer of Farmers Bank" signed and filed by counsel for the bank. Secondly, the attorneys who prepared and filed the 18 page answer (Govt.Ex.FDIC–22) did not testify, and no other evidence was presented that the defendants furnished this particular information to the attorneys or chose the specific language charged to be false. Count Thirty describes the loans as "nominee loans" while Count Thirty–One describes the same loans as "accommodation loans." This underscores the need for the definition of both terms, and such definitions were not properly before the Court. Even if the Prosecution met its burden of establishing that these seven loans were nominee loans or accommodation loans as that term was known or should have been known to the defendants, there is absolutely no evidence that the Hollands intended to mislead or deceive regulatory authorities since all of the documentary evidence relating to the loans was produced to the FDIC. Included in the documents made available to the FDIC was the evidence that in five of the seven questioned loans the proceeds checks were made payable directly to Dr. March and, in the other two, the proceeds checks were made payable to Mrs. March who immediately endorsed them to her husband. The handling of the disbursements in this manner negates any attempt to deceive.[50]

Count Thirty–One charged both defendants with obstruction of justice with respect to the allegation "lacks sufficient information to admit or deny...." This phrase is well known to trial practitioners as boilerplate language utilized by attorneys in defensive pleadings. Reliance on this language in a pleading not signed by either defendant as the basis for an obstruction of justice charge is vexatious when the underlying statement is not one of fact but of the FDIC's or Prosecution's interpretation. The Court FINDS that the actions of the Prosecution in pursuing both false statement and obstruc-

tion of justice charges in Counts Thirty and Thirty–One were vexatious.

### K. COUNT ONE

Count One charged the defendants with conspiracy to commit an offense against or to defraud the United States. The overt acts recited in the indictment in support of the conspiracy are the same acts relied upon by the Prosecution in Counts Two through Thirty–One. As each of these counts have fallen, so must the conspiracy count. While the Court does not find that Count Twenty–Two was prosecuted vexatiously, this count involved Holland Jr. only and there was no evidence of any conspiracy between Holland Jr. and Holland Sr. with regard to the preparation and signing of the document which was the subject of Count Twenty–Two. Therefore, Count Twenty–Two, standing alone, does not constitute sufficient evidence of a conspiracy and the Court FINDS that the lack of evidence of criminal intent was so obvious that prosecuting the conspiracy charge was also vexatious.

### PART V. REASONABLENESS OF THE REQUESTED FEES AND COSTS

The Court has previously ruled that section 2412(b) governs the procedures and limitations in this case and, therefore, the procedures and limitations in section 2412(d) are not applicable. At the Application hearing, the Court requested that the parties seek an agreement concerning the amount of attorneys fees and litigation costs which were reasonable under section 2412(b) of the EAJA, for the services performed from the January 6, 1998 hearing through the Hyde Amendment Application hearing of August 19, 1998. The parties agree that Richard J. Holland Sr.'s attorney's fees of $297,473.65 and litigation expenses and costs of $40,838 are reasonable. Furthermore, the parties agree that Richard J. Holland Jr.'s attorney's fees of $216,844.35 and litigation expenses and costs of $15,512.00 are reasonable.[51]

---

**50.** Def.Ex. 745, Fraher memo of April 16, 1992 to Barringer at P. 4, "The evidence that Lloyd March was the recipient of the proceeds of the loans is plain enough, since the bank issued several of the loans in the form of cashier's checks payable to Mr. [Dr.] March."

**51.** The Government's agreement as to the reasonableness of the fees and litigation costs is without prejudice to its contention that no such fees and costs are appropriate, and, if appropriate, are limited by section 2412(d).

PART VI. APPORTIONMENT OF DAMAGES

 The Hyde Amendment provides that any fees and litigation costs assessed thereunder shall be paid by the offending agency from its regular budget. The question arises as to whether the FDIC or the Department of Justice, as the parent organization of the U.S. Attorney's Office for the Eastern District of Virginia, should bear such fees and costs. In *United States v. Gardner,* 23 F.Supp.2d 1283 the Court found both the investigating agency (the IRS) and the prosecution potentially liable.

With respect to the pending Application, the Court has found that the conduct of both agencies was vexatious. Therefore, the Court could find both agencies jointly and severally liable, which should result in an equal division of payment. Alternatively, no impediment has been offered to a pro-rata assessment of damages based upon the relative responsibility of each agency.

Because prosecutions are controlled in the final instance by the U.S. Attorney's Office, the Court FINDS that it should bear the greater portion. Although the Court has found that the U.S. Attorney's office did the bidding of the FDIC, the charges could have been dismissed upon all or any of the counts, but the Prosecution failed to do so. Accordingly, the Court FINDS that Sixty–Seven Percent (67%) of the obligation should be borne by the Department of Justice and the remaining Thirty–Three Percent (33%) by the FDIC.

PART VII. CONCLUSION

The Court GRANTS both of the Hollands' motions for attorneys' fees and costs pursuant to the Hyde Amendment and section 2412(b) of the EAJA and AWARDS fees of $297,473.65 and litigation expenses and costs of $40,828.00 to Richard J. Holland Sr. The Court also AWARDS to Richard J. Holland Jr. fees of $216,844.35 and litigation expenses and costs of $15,512.00. Further, the Court GRANTS the Hollands' motion to strike the Government's proposed expansion of the record and DENIES the Hollands' proposal to expand the record. Finally, for the reasons stated at the August 19, 1998 hearing, the Court GRANTS Richmond Newspapers, Inc.'s motion to intervene and unseal the redacted pleadings filed in response to the Hyde Amendment Application, except that the post-trial affidavits and grand jury testimony not utilized at trial shall remain under seal.